239 N.J. Super. 563 (1990)
571 A.2d 1329
ANN DANIEL, EXECUTRIX OF THE ESTATE OF BARBARA RHEM, DECEASED, JAMES RHEM, DEBORAH RHEM, A. RENEE RHEM, INDIVIDUALLY, WILLIAM RHEM AND ANABEL RHEM, PLAINTIFFS-RESPONDENTS,
v.
STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORTATION, DEFENDANT-APPELLANT, AND GEORGE JONES, JR., DEFENDANT-RESPONDENT, AND 5700 ATLANTIC AVENUE CORPORATION, T/A T-K'S PUB, GEORGE JONES, SR., AND JOHN DOE, A FICTITIOUS NAME, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 1990.
Decided March 19, 1990.
*569 Before Judges KING, SHEBELL and BAIME.
*570 John M. Armstrong, Deputy Attorney General, argued the cause for appellant (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; John M. Armstrong on the brief).
Fred M. Klatsky argued the cause for respondent Ann Daniel, Executrix of the Estate of Barbara Rhem, deceased, James Rhem, Deborah Rhem, and A. Renee Rhem, Individually (Klatsky & Klatsky, attorneys: Fred M. Klatsky on the brief).
Kenneth Javerbaum argued the cause for respondents William Rhem and Anabel Rhem (Javerbaum & Wurgaft, attorneys; Anthony P. Valenti on the brief).
The brief of respondent George Jones, Jr., was suppressed.
The opinion of the court was delivered by BAIME, J.A.D.
Defendant, the State of New Jersey (State) by the Department of Transportation (DOT), appeals from a judgment in favor of plaintiff Ann Daniel, the executrix of the estate of Barbara Rhem, awarding damages for the death of the decedent as the result of an automobile accident. The accident occurred in the early morning hours of July 5, 1982 when defendant George Jones, Jr., while travelling west on Route 30, crossed the median and collided head-on with a vehicle driven in the opposite direction by William Rhem, the decedent's cousin. Jones' automobile then struck a second car driven by Albert Horner. In the collision, all parties sustained serious injuries and the decedent, a passenger in the Rhem automobile, died shortly thereafter.
On February 17, 1983, plaintiff instituted this action by filing a complaint in the Superior Court, Law Division, naming as defendants Jones, William Rhem, the State and 5700 Atlantic Avenue Corporation, the licensed owner of T-K's Pub. In her complaint, plaintiff alleged that both Jones and Rhem were negligent in the operation of their respective automobiles. She further contended that T-K's Pub was at fault in continuing to *571 serve alcoholic beverages to Jones, who was allegedly visibly intoxicated. Rhem filed a cross-claim against Jones and the State.
In the action against the State, plaintiff and Rhem asserted that the accident was caused in part by the dangerous condition of the road. Specifically, they claimed that the highway was dangerous at the time of the accident as a result of road work performed by the DOT in 1970 and 1981, which had the effect of reducing the curb height of the median from its original eight inches to two inches. The reduction of the curb height in 1970 and the asphalt paving of the median in 1981 were said to have created a "ramp-like" effect, causing Jones' automobile to be catapulted into the lanes of on-coming traffic.
Following extensive discovery proceedings, the State moved for summary judgment, contending that the curb height had been purposely lowered in the 1970 project by a "super-elevation" or "banking" of the roadway on the curve where the accident occurred. The State argued that the work performed in 1970 constituted an "improvement" to Route 30 pursuant to a "plan" or "design" and it was thus immune from suit under the provisions of N.J.S.A. 59:4-6. In an oral opinion, the Law Division judge granted partial summary judgment, finding that the 1970 "super-elevation" of the highway fell within the purview of the statutory immunity provided by N.J.S.A. 59:4-6, but that factual questions remained with respect to the asphalt paving of the median in 1981. The issues of liability and damages were bifurcated by order of June 1, 1984.
The trial on the question of liability commenced on October 21, 1985. Immediately prior to selection of the jury, the wrongful death and survivorship actions against William Rhem were settled. At the conclusion of plaintiff's case, the Law Division judge granted the State's motion for an involuntary dismissal on the basis that the "palpably unreasonable" conduct standard contained in N.J.S.A. 59:4-2 had not been proved. In making this determination, the judge erroneously held that plaintiff *572 was required to prove the State received actual notice of the dangerous condition. Plaintiff's case against T-K's Pub was also dismissed for lack of evidence. An order was thereafter entered assessing 100% liability against Jones.
In an unreported opinion, we reversed both the partial summary judgment predicated on plan or design immunity and the later involuntary dismissal. We found that genuine issues of material fact existed with respect to (1) whether the 1970 project was an "improvement" or merely "maintenance," (2) whether the plans were properly approved, (3) whether the reduction in curb height was a part of the plans and was actually considered by the DOT and (4) whether the employee who allegedly approved the plans possessed the requisite authority. We thus determined that the Law Division should not have granted the State's motion for summary judgment. We also found that the involuntary dismissal was improper because the Law Division had incorrectly interpreted N.J.S.A. 59:4-2 to require actual notice of the dangerous condition even if it was created by a public employee. We noted that N.J.S.A. 59:4-2 requires that the plaintiff prove either that the State created the dangerous condition or had notice of its existence. In the course of our opinion, we rejected plaintiff's argument that on the retrial, the State should not be permitted to present evidence relating to Jones' ingestion of alcoholic beverages. We observed that the State had presented sufficient evidence to allow the jury to decide whether alcohol played a role in causing the accident. In that respect, we explained that a cautionary instruction could be given to obviate any potential for undue prejudice that might otherwise arise by reason of the admission of the evidence. We observed that "the jury may consider whether the State's action denied other motorists of protection against drunk or errant drivers and whether such [conduct] was palpably unreasonable."
Following the Supreme Court's denial of the State's petition for certification, a retrial was commenced on May 2, 1988. Over the State's vigorous objections, questions pertaining to *573 whether the roadway was in a dangerous condition and the accident caused in part by the DOT's palpably unreasonable conduct were submitted to the jury. In addition, the trial court denied the State's claim that, as a matter of law, it was immune from liability because the condition was created by reason of an "approved plan or design" or was the subject of a public official's exercise of discretion. Thus, questions relating to the State's claims of immunity were also presented to the jury.
The jury returned a verdict, finding that Jones was 40% and the State 60% at fault. With respect to the liability of the State, the jury determined that the DOT had created a dangerous condition, that it had acted in a palpably unreasonable fashion, that the defects in the median constituted a proximate cause of the accident and that none of the statutory immunities was applicable. The damage phase of the case was later settled as to all plaintiffs, the State agreeing to pay $650,000, with post judgment interest accruing from June 14, 1988. The State reserved the right to appeal with respect to the question of its liability.
The State now appeals, contending that (1) the trial court erroneously instructed the jury to consider whether the DOT's acts failed to protect plaintiffs from drunk and errant drivers, (2) the evidence failed to establish that the defects in the median constituted a proximate cause of the accident, (3) "plan or design immunity" and "discretionary conduct" immunity were proven as a matter of law and (4) cross-examination of the State's expert witness with respect to extrapolation evidence improperly prejudiced the DOT and deprived it of a fair trial.
We affirm. We are convinced that the evidence, viewed most favorably to plaintiff, was sufficient to present a jury question as to whether the cumulative effect of the 1970 and 1981 projects was such as to create a dangerous condition proximately causing the accident resulting in Barbara Rhem's death. We are also satisfied that a jury question was presented with respect to whether the DOT's action was palpably unreasonable *574 under the circumstances. So too, we agree with the trial court's conclusion that reasonable minds could differ with respect to the applicability of the statutory immunities. We also find no error in the failure of the trial court to restrict plaintiff's cross-examination of the State's expert witness. We further conclude that the trial court's instructions pertaining to the definition of a dangerous condition did not constitute reversible error. Although we find errors in the court's charge, we are convinced that, within the context of the protracted trial, they were harmless and did not impair the State's substantial rights.

I.
A thorough recital of the facts is necessary for a full understanding of the issues presented. Although the facts regarding the occurrence of the accident are not in dispute, the actual cause of the incident is hotly contested. It is uncontroverted that Jones' automobile crossed over the median of Route 30 at mile marker 4.1 in Atlantic County and struck two vehicles travelling eastbound in the opposite lane.
According to William Rhem, at approximately 2:15 a.m. on July 5, 1982 he and his cousin, Barbara, left Red Bank, intending to visit an Atlantic City casino. It was a clear and dry morning and the driving conditions were excellent. Rhem drove Barbara's 1980 Pontiac Sunbird, while she sat in the front passenger's seat. The Rhems exited the Garden State Parkway and entered eastbound Route 30. The Rhems travelled in the right lane of Route 30, which is a divided highway with two eastbound lanes and two westbound lanes. Rhem moved his automobile into the left lane to accommodate a vehicle entering Route 30 east. At that point, Rhem was travelling at between 35 and 50 m.p.h. Rhem testified that shortly thereafter he suddenly observed an airborne object directly in front of his automobile. According to Rhem, the car "appeared as though it was coming right out of the sky ..." and "hit the windshield. *575 ..." As we noted previously, Rhem sustained serious injuries and was hospitalized for approximately six months.
Rhem's account of the incident was substantially corroborated by Albert Horner. Horner testified that he entered Route 30 eastbound immediately prior to the accident. As he eased his automobile from the entrance ramp into the right lane, Horner noticed a car behind him, subsequently identified as the Rhem vehicle, move into the left lane in order to allow him onto the road. Driving his automobile at a moderate rate of speed, Rhem passed Horner on the left. Horner testified that the Rhem vehicle was approximately one car-length in front of his automobile in the left lane. As they were entering a curve veering toward the left, Horner noticed "lights flying up in the air, [and] saw an undercarriage of a vehicle...." According to Horner, the automobile struck Rhem's vehicle first, then crashed into his.
Horner did not lose consciousness and was able to provide the police with a complete description of the incident. According to Horner, he was travelling at approximately 45 m.p.h. while the Rhem vehicle was "going a little faster." It is undisputed that the speed limit at the accident site was 50 m.p.h. Horner testified that the Jones vehicle flew over the median from the westbound lanes and "stopped Rhem's car dead in its tracks and [then] proceeded in a straight line ..." crashing into his automobile. Horner was severely injured in the accident.
Jones' testimony added little to Rhem's and Horner's account of the incident. He testified that he was on his way home from T-K's Pub in Atlantic City when the accident occurred. He was driving alone in his father's Pontiac Catalina. However, Jones was unable to remember anything from the time he left his home for T-K's Pub at approximately 11:00 p.m. on July 4, 1982, until he awoke in the hospital after the accident.
Captain Edward Klimecke, a member of the Atlantic City Police Department, testified that he was notified of the accident at approximately 5:00 a.m. on July 5, 1982. On arrival at the *576 hospital, the decedent was pronounced dead at 5:28 a.m. Klimecke obtained statements from Jones, Rhem and Horner. The testimony of the witnesses at trial substantially mirrored the information contained in the statements given shortly after the accident. At 7:30 a.m., blood samples were taken from Rhem and Jones. According to Klimecke, Rhem's blood alcohol content was .000. Jones' blood alcohol content was .053.
Much of the evidence presented at trial concerned the condition of the roadway and the median on the morning of the accident. The pre-1970 history of the road is undisputed. Route 30 was acquired by the DOT from Atlantic County in 1948. In 1950, the State used outside contractors to reconstruct Route 30, developing it into a four-lane highway, with two eastbound and two westbound lanes divided by a concrete median with eight inch high curbs constructed of grayish-white Portland concrete. The plans for the project were signed and approved by the State Highway Engineer and the State Highway Commissioner.
In 1956, the State used outside contractors to construct "turnarounds" in the median. The median, constructed of the same type of concrete, was widened in certain areas, with the eight inch curb retained. The median was widened 14 feet and narrowed to four feet in some areas to accommodate the turnaround lane. The 1956 plans were signed, evincing approval by the Director and Chief Engineer, the State Highway Engineer and the State Highway Commissioner. The 1950 plan as well as the 1956 plan specifically provided for an eight inch median curb height. At some point prior to 1970, the turnarounds were removed and the area was filled in with concrete to meet the width of the existing median.
At trial, both plaintiffs and the State focused on the road projects that were undertaken by the DOT in 1970 and 1981. The State contended that the work performed by the DOT in 1970 was intended to "bank" the roadway and decrease the curb height of the median. The State thus urged that the *577 project was performed in accordance with a plan or design and was approved by the DOT.
Charles Edson, currently the Assistant Commissioner of Construction and Maintenance in the DOT, provided detailed testimony concerning the 1970 project. The principal thrust of his testimony was that the 1970 project involved a deliberate high level decision to bank the roadway and diminish the height of the median curb. In 1970 Edson was the District Superintendent for Maintenance and Equipment in Region IV, which encompasses the accident site. Edson testified that he supervised the 1970 project. According to Edson, sections of Route 30 had become "worn out of shape and settled" due to subsurface soil conditions. The project consisted of "fill[ing] in holes" at some locations and creating a "super-elevation" in other areas. A "super-elevation," according to Edson, was constructed in the area of milepost 4.1 on the westbound side of the road. Edson explained that a "super-elevation" is realized by "banking" the road surface or "tilt[ing] [the road] so that automobiles can better negotiate turns and curves." Edson testified that the "super-elevated" area of approximately 11,000 feet included the portion of the highway where Jones crossed the median.
Edson testified that the super-elevation required approval by Rudolph Peterson, then the Supervising Engineer of the Bureau of Maintenance. According to Edson, Peterson was the highest official in the Bureau of Maintenance. Edson related that he had reviewed plans for the project with Peterson prior to its commencement. Edson testified that he discussed with Peterson the super-elevation as well as the reduction of the curb from eight inches to two inches. According to Edson, Clifford Price, a Region IV engineer, was directed to prepare plans for a "standard super-elevation" leaving two inches of curb facing remaining.
We digress and note, however, the record discloses substantial evidence throwing doubt on Edson's claim that the 1970 project contemplated a "super-elevation" with a corresponding *578 reduction in curb height. The paperwork for this project consisted of a work order, several "profile sheets,"[1] "offset sheets,"[2] and a transmittal letter. Notwithstanding Edson's trial testimony, the word "super-elevation" appears neither in the transmittal letter nor in the attached plan sheets. Additionally, the work order does not refer to super-elevation. Moreover, we note Edson's concession that the profile sheets were neither dated nor signed, despite spaces provided for dates and signatures. In addition, the offset sheets are post-dated September 29, 1970 and October 8, 1970, strongly suggesting that Peterson did not see them when he "allegedly" approved the project. Furthermore, the work order bears a stamp of the name "RAA Peterson." An original signature does not appear on the document. Peterson was not produced as a witness at trial.
The facts pertaining to the asphalt paving of the median in 1981 were also hotly disputed by the parties. In the mid-1970's, the concrete median began to deteriorate due to salt water saturation which had occurred during flooding. The salt water apparently caused the bond between the sand and stone of the concrete to disintegrate. As a result, stones or "spalling" from the median were regularly falling into the travel lanes of Route 30.
Several employees of the DOT were aware of this condition due to personal observation as well as correspondence from the public. According to Michael Kjetssa, currently Director of the Division of Maintenance, Construction and Maintenance Support, the DOT initially responded to the problem by dispatching *579 maintenance personnel to periodically sweep the spilling concrete from the roadway. In 1981, Oliver Kee, the DOT's Regional Maintenance Engineer for Region IV, met with Kjetssa and suggested that "[t]he best solution [was] to replace [the] center median with ... center barrier curbing ... approximately three-and-a-half [feet] high." Kee indicated that another solution was to "remove this disintegrated portion of the island, blacktop the area, and paint a simulated island." Kee testified that it would have been a "[w]aste of time and money to repair it as it was when it was originally constructed...."
However, Kee testified that at Kjetssa's instruction, he removed the deteriorated concrete and replaced it with blacktop asphalt, also referred to as bituminous pavement. Kee testified that there were no written instructions. This was confirmed by Kjetssa, who testified that although there were no written plans for the 1981 work, it was "understood" that the job required the median to be "restore[d] in kind." The 1981 asphalt work was described by Kjetssa as a "seat of our pants job." Kjetssa and Kee both characterized the work as a maintenance function that was similar to filling in a pothole, "a patch job."
At trial, plaintiff contended that the cumulative effect of the 1970 and 1981 projects was the creation of a "ramp" with a tendency to "catapult" automobiles across the median into lanes of oncoming traffic. In support of this contention, plaintiff presented the testimony of a consulting engineer, Herman Rich. Rich testified that an eight inch median provides a physical barrier against vehicles crossing over into opposing lanes. According to Rich, under industry standards, an eight inch curb is defined as a "barrier curb." A barrier curb has a vertical face and ranges from six to ten inches in height. In contrast, a "mountable curb" has a sloping face and is less than six inches in height. Rich testified that a barrier curb is often necessary, depending upon the degree of curvature of the roadway. A barrier curb has the effect of deflecting an automobile *580 about to traverse a center median, thereby narrowing the potential for head-on collision.
According to Rich, a barrier curb would have redirected Jones' vehicle and would have either prevented it from crossing the median or, at the very least, changed its course so as to avoid the collision with Rhem's and Horner's automobile. Rich explained that "in all probability there would not have been contact with the Rhem vehicle because either the curbing would have totally deflected the [Jones automobile]" or "would have altered its path." Rich concluded by indicating there was "a high probability that had the presence of a deflecting force ... caused by the eight inch curb ... been involved ... contact never would have occurred."
According to Rich, the asphalt paving of the median in 1981 "exacerbated" the danger caused by the reduction of the curb height. Without the asphalt paving, contact with the two inch curb facing might have alerted Jones to the precarious position in which he had placed his automobile prior to crossing the median. The suggestion was that perhaps evasive or corrective action could have been taken by Jones had he been alerted in time. Rich testified that, instead, the blacktop surface acted as a "kind of a ramp," causing Jones' automobile to become airborne.
The State disputed this thesis. Dr. Alain Kornhauser, a defense witness, testified that "had an eight inch curb, as in the 1950 and 1956 plan, been in existence ... then there would not have been a redirection." Rather, "the [Jones] vehicle would have continued across [the median] and the collision would have occurred." Dr. Kornhauser testified that a barrier curb would have altered the path of Jones' automobile only an "infinitesimal amount."
Based upon the foregoing evidence, the jury found that the State was 60% at fault. The State's motion for a new trial was subsequently denied. We now consider the State's arguments.

*581 II.
We first address the State's contention that the trial court committed reversible error in its jury instructions pertaining to the definition of "dangerous condition." More specifically, the State asserts that the trial court erred by instructing the jury to consider whether the DOT's "actions denied other motorists of protection against drunk or errant drivers." The State contends its duty is confined to insuring that public property is reasonably safe for its objectively intended use and that it owes no responsibility to protect individuals from the dangerous activities of others, even if the perils created thereby are reasonably foreseeable. The trial court's charge is said to have run afoul of this principle.
In response, plaintiff argues that the trial court's instruction pertaining to the State's duty was mandated by our earlier opinion. Plaintiff thus asserts that our decision constitutes the law of the case. Implicit in plaintiff's contention is the thesis that we may not collaterally review our prior decision, but instead must simply determine whether there was compliance with the mandate of that opinion.
Preliminarily, we are convinced that our role is not so narrowly circumscribed. The law of the case doctrine requires judges to respect unreversed decisions made during the trial by the same or a higher court regarding questions of law. State v. Reldan, 100 N.J. 187, 203, 495 A.2d 76 (1985). The doctrine is grounded in the policy that once an issue is litigated and decided in a suit, relitigation of that question should be avoided if possible. State v. Hale, 127 N.J. Super. 407, 410, 317 A.2d 731 (App.Div. 1974). Two separate and distinct branches of the rule exist. The first pertains to instances where a judge or court of equal position has resolved an issue on an interlocutory basis. In that context, "[t]he doctrine is discretionary and the court is never irrevocably bound by its prior interlocutory ruling...." Sisler v. Gannett Co., Inc., 222 N.J. Super. 153, 159, 536 A.2d 299 (App.Div. 1987), certif. den. 110 N.J. 304, 540 *582 A.2d 1283 (1988). Prior decisions on legal issues should be followed unless there is substantially different evidence at a subsequent trial, new controlling authority, or the view expressed previously was clearly erroneous. State v. Reldan, 100 N.J. at 204, 495 A.2d 76. However, the doctrine "should be applied flexibly to serve the interests of justice." Id. at 205, 495 A.2d 76. In contrast, "[w]here the rule is applied to a prior appellate decision in the same case, the doctrine is more stringent." Sisler v. Gannett Co., Inc., 222 N.J. Super. at 160, 536 A.2d 299. Stated somewhat differently, the law of the case doctrine requires that a decision of law be respected by all lower courts during the pendency of the case. State v. Reldan, 100 N.J. at 203, 495 A.2d 76. It is the responsibility of a trial judge to comply with the pronouncements of a superior court. State v. Smith, 169 N.J. Super. 98, 100, 404 A.2d 331 (App.Div. 1979), rev'd on other grounds 85 N.J. 193, 426 A.2d 38 (1981).
We deem the doctrine wholly inapplicable in this case. Initially, we point out that the statement in our prior opinion regarding drunk or errant drivers was made in an entirely different context. The simple and overriding fact is that our isolated and fleeting allusion to the State's duty was made in determining whether evidence of Jones' ingestion of alcohol was admissible. Our purpose was merely to apprise the parties of our view that involvement of a "drunk or errant" driver would not automatically absolve the State of liability. We did not hold or intend to suggest that the State's obligation was either co-extensive with those of private property owners or somehow encompassed the duty to protect innocent individuals from all dangerous activities of others on publicly owned land.
This much conceded, we are satisfied that this was not the import of the instructions given by the trial court. The court's charge did not convey the idea that it was incumbent upon the DOT to construct and maintain roads in such a way as to guarantee the safety of innocent drivers from all of the risks attendant to the dangerous acts of others. Further, in the *583 context of the alleged dangerous condition, i.e., the transformation of a barrier into a ramp with a propensity to catapult vehicles across the median and into oncoming traffic, it would make no difference whether the former barrier area was contacted because of improper driving or a motorist exercising due care in attempting to avoid an obstacle in the lane of travel. Read in their entirety, the court's instructions fairly apprised the jury that a dangerous condition is one that poses an unjustifiable risk of injury when used in an objectively reasonable manner. Although the court's charge was not error-free, we are convinced that it adequately informed the jury of the applicable legal principles, and that any error was clearly harmless. Because of the importance of the questions raised regarding the definition of a dangerous condition, we quote this portion of the court's instructions verbatim:
The term dangerous condition has a particular meaning. In order for you to find there was a dangerous condition, a dangerous condition of public property, you must be satisfied by a fair preponderance of the credible evidence that each of the following elements have been established:
First, that the condition in question was one that created a substantial risk of injury. A risk that was not minor, trivial or insignificant to a person using the property with due care; that is, reasonable care for his or her own safety, and in the manner that the public entity ought to have reasonably foreseen or expected people to use the property.
In this particular case, with due care for one's own safety, is viewed from the perspective of the persons making the claim, that would be Mr. Rhem and the Daniel's estate, and there's no proof other than the driver and passengers of the Rhem car were using the highway with due care; so that's not the worry. The conditions that are pertinent here would be that the condition was one that created a substantial risk of injury, one that is not minor, trivial or insignificant. Secondly, that the condition was one that created a reasonably foreseeable risk of the kind of injury alleged by the plaintiff. It need not be exactly the very same kind, but it must be an injury of the same class or type.
Thirdly, that the condition was either created by the negligence or wrongful act or omission of an employee or employees of the defendant, State of New Jersey, within the scope of their employment; or alternatively, that the defendant, State of New Jersey, either had actual or constructive notice of the dangerous condition a sufficient time prior to the injury, to have taken measures to repair, remedy or correct it, or to provide safeguards or to warn of the condition.
A defendant has actual notice of a dangerous condition if you're satisfied that it actually knew the condition existed, and knew or should have known of its *584 dangerous character. There's constructive notice of the condition if you're satisfied that the condition had existed for such a period of time, and was of such obvious nature that the public entity, in the exercise of due and reasonable care, should have discovered the condition and its dangerous character.
You are to consider whether the State's action in this case denied plaintiff protection against drunk or errant drivers, and whether such action was palpably unreasonable.
The trial court's instructions must be considered within the context of the statutory framework of the Tort Claims Act (N.J.S.A. 59:1-1 to:14-4). In Willis v. Department of Conservation & Economic Dev., 55 N.J. 534, 264 A.2d 34 (1970), our Supreme Court partially abrogated the sovereign immunity doctrine, stating that "[i]t [was] time for the judiciary to accept ... responsibility and to adjudicate the tort liability of the State itself." Id. at 540, 264 A.2d 34. Following the decision in Willis, the Attorney General issued an exhaustive report concerning the law in this area and made extensive recommendations for change. Report of the Attorney General's Task Force on Sovereign Immunity (1972). The Attorney General's Report was the genesis of the Act. Although the Legislature clearly intended to ameliorate the harsh results of strict application of the common law doctrine of sovereign immunity, the basic approach of the Act is to broadly limit public entity liability. See Kolitch v. Lindedahl, 100 N.J. 485, 492, 497 A.2d 183 (1985); Hake v. Manchester Tp., 98 N.J. 302, 317, 486 A.2d 836 (1985); Bell v. Bell, 83 N.J. 417, 423, 416 A.2d 829 (1980). The Act re-established sovereign immunity against tort claims except where there is a specific statutory declaration of liability. See Bell v. Bell, 83 N.J. at 423, 416 A.2d 829; Malloy v. State, 76 N.J. 515, 518-519, 388 A.2d 622 (1972); N.J.S.A. 59:1-2.
One of the statutory predicates for liability is a dangerous condition on public property. The operative statute provides as follows:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

*585 a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable. [N.J.S.A. 59:4-2].
Essential to resolution of the issue presented here is the statutory definition of the term "dangerous condition." Under the Act, a dangerous condition is one that "creates a substantial risk of injury when [public] property is used with due care in a manner in which it is reasonably foreseeable that it will be used." N.J.S.A. 59:4-1a.
Despite its disarming simplicity, this definition of "dangerous condition" has spawned substantial litigation. See, e.g., Burroughs v. City of Atlantic City, 234 N.J. Super. 208, 214, 560 A.2d 725 (App.Div. 1989); Ross v. Moore, 221 N.J. Super. 1, 5, 533 A.2d 398 (App.Div. 1987); King by King v. Brown, 221 N.J. Super. 270, 275, 534 A.2d 413 (App.Div. 1987); Sharra v. City of Atlantic City, 199 N.J. Super. 535, 540-541, 489 A.2d 1252 (App.Div. 1985); Speaks v. Jersey City Housing Auth., 193 N.J. Super. 405, 411, 474 A.2d 1081 (App.Div. 1984), certif. den. 97 N.J. 655, 483 A.2d 177 (1984); Speziale v. Newark Hous. Auth, 193 N.J. Super. 413, 419, 474 A.2d 1085 (App.Div. 1984); Cogsville v. Trenton, 159 N.J. Super. 71, 74, 386 A.2d 1362 (App.Div. 1978); Setrin v. Glassboro State College, 136 N.J. Super. 329, 332-333, 346 A.2d 102 (App.Div. 1975). In Burroughs v. City of Atlantic City, we exhaustively reviewed and analyzed these decisions in the context of a claim filed by a plaintiff who was "injured while using public property for an activity that was specifically prohibited by the public entity but, nonetheless, was arguably foreseeable." Id. 234 N.J. Super. at 214, 560 A.2d 725. Synthesizing existing authority, we observed that "whether a dangerous condition is present depends on a combination of factors relating to physical condition, permitted conduct, and objectively foreseeable behavior." Id. *586 at 218-219, 560 A.2d 725. We noted "that a public entity's liability for accidents occurring on its property [was] not co-extensive with the liability of private landowners." Id. at 219, 560 A.2d 725. In other contexts, it has been said that as to a private party, liability may attach even as to an unintended use if that use is otherwise foreseeable. Cf. Rivera v. Westinghouse Elevator Co., 107 N.J. 256, 260, 526 A.2d 705 (1987). See also Wytupeck v. Camden, 25 N.J. 450, 460, 136 A.2d 887 (1958); Imre v. Riegel Paper Corp., 24 N.J. 438, 443-445, 132 A.2d 505 (1957); Healing v. Security Steel Equipment Corp., 51 N.J. Super. 123, 132-133, 143 A.2d 844 (App.Div. 1958). However, we observed it was "unlikely that the Legislature intended to expose a public entity to liability under circumstances where: (1) the public property is safe for its objectively intended use; (2) the public entity has specifically prohibited by [law] a known but unintended use of the property; and (3) the public entity has posted signs to that effect and instructed employees to stop the prohibited activity when it is observed." Burroughs v. City of Atlantic City, 234 N.J. Super. at 219-220, 560 A.2d 725. We thus held that the public entity was not responsible for injuries sustained by reason of plaintiff's unpermitted, but reasonably foreseeable, use of the property. Id. at 220, 560 A.2d 725.
Of course, the facts here are substantially different. As accurately noted by the trial court, the record is barren of any evidence that the Rhem vehicle was driven without due care when the accident occurred. The question remains, however, whether the condition of Route 30 was such as to "create a substantial risk of injury when ... used with due care" in a reasonably foreseeable manner. N.J.S.A. 59:4-1a.
As we understand the statute, the phrase "used with due care" does not refer to the actual activities of the parties. Rather, the focus is on the condition of the property itself. See Sharra v. City of Atlantic City, 199 N.J. Super. at 540, 489 A.2d 1252; Rodriguez v. N.J. Sports & Exposition Authority, *587 193 N.J. Super. 39, 44-45, 472 A.2d 146 (App.Div. 1983), certif. den. 96 N.J. 291, 475 A.2d 586 (1984); Cogsville v. Trenton, 159 N.J. Super. at 74, 386 A.2d 1362; Setrin v. Glassboro State College, 136 N.J. Super. at 322-333, 346 A.2d 102. In deciding whether a dangerous condition exists, the fact-finder must determine whether the property creates a substantial risk of injury "to persons generally, who would use the property with due care in a foreseeable manner." Holmes v. Oakland City, 260 Cal. App.2d 378, 387-388, 67 Cal. Rptr. 197, 203 (App.Ct. 1968) [Emphasis in original]. Accordingly, in order to prove his case, "plaintiff must show `that the condition was one that created a hazard to a person who foreseeably would use the property ... with due care.'" Ibid. [Emphasis in original].
The reasonable user requirement contained in N.J.S.A. 59:4-1a thus presupposes some uniform standard of behavior with regard to persons utilizing public property. However, the infinite variety of situations that may arise makes it impossible to fix definite rules in advance of all conceivable conduct. In other words, it would be impossible for a public entity to prognosticate every imaginable way in which its property can or will be used. In a similar vein, it would be folly to impose a burden on a public entity to protect individuals from every conceivable risk attendant to the use of its property. The Legislature has dealt with this problem by creating a fictitious person, a reasonable person of ordinary prudence. Under the statutory definition, a dangerous condition exists if the property poses a substantial risk of injury when it is used in a reasonably prudent manner in a foreseeable way. To that extent, the reasonable user requirement does not refer to the actual activities of the plaintiff or others. Rather, it constitutes a personification of a community ideal of reasonable behavior.
In that context, the trial court erred when it referred solely to the Rhems' behavior in determining whether the property presented a dangerous condition. Contrary to the instruction given in this case, the actual conduct of the plaintiff *588 is wholly irrelevant to this inquiry. Thus, a plaintiff "may be able to establish the existence of a dangerous condition even though he personally may have been contributorily negligent." Speziale v. Newark Hous. Auth, 193 N.J. Super. at 419, 474 A.2d 1085. Under the Act, "[c]ontributory negligence shall not bar recovery...." N.J.S.A. 59:9-4. A person who negligently contributes to the injury he sustains is not barred from bringing suit as long as it can be shown that there was a defect in the public property and that the harm would have occurred even had he exercised due care. Ibid.
In a similar vein, "we have consistently rejected the contention that dangerous activities of other persons on public property, even if reasonably foreseeable, establish a dangerous condition of the property itself."[3]Ross v. Moore, 221 N.J. Super. at 5, 533 A.2d 398. See also Sharra v. City of Atlantic City, 198 N.J. Super. at 540-541, 489 A.2d 1252; Setrin v. Glassboro State College, 136 N.J. Super. at 333-335, 346 A.2d 102. As a public landowner, the State is not obliged to anticipate and protect against every conceivable dangerous activity by others. Rather, the State is entitled to assume that its property will be used with due care in a reasonably foreseeable manner.
A contrary construction of the statute would subvert the legislative plan and the policy concerns that undergird the Act. The Legislature recognized that "the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done." N.J.S.A. 59:1-2. The point to be stressed is that a public entity should not be encumbered *589 with the duty to anticipate and guard against all prohibited, but arguably foreseeable, uses of its property. In this respect, N.J.S.A. 59:4-1a means exactly what it says. A condition is not dangerous unless it "creates a substantial risk of injury when ... used with due care" in a reasonably foreseeable manner. Stated obversely, property is considered dangerous if, when used with due care in a reasonably foreseeable manner, it presents a significant risk of injury.
Applying these principles here, the State bears no greater obligation than to construct and maintain its roads in a reasonably safe condition for their intended use. The State does not owe a duty to protect individuals against all of the foreseeably unsafe or unreasonable driving habits of others. The State fulfills its obligation by providing roads that are reasonably safe for their objectively intended use.
This case presents several complicating factors, however. It is one thing to say that the State, in constructing and maintaining its roads, owes no duty to protect individuals against all of the risks attendant to the dangerous driving habits of others. It is quite another to suggest that the State may, consistent with its public responsibilities, wholly ignore all reasonably foreseeable and known risks. More importantly, in the context of the facts of this case, it can hardly be said that the State may create a condition that substantially exacerbates the perils or hazards attendant to automobiles which, for one reason or another, make contact with a median. For example, we have held that a dangerous condition of property may be found to exist "when an unreasonable risk of harm is created by a combination of defect in the property and acts of third parties." Speaks v. Jersey City Housing Auth, 193 N.J. Super. at 412, 474 A.2d 1081, quoting Duarte v. State, 88 Cal. App.3d 473, 151 Cal. Rptr. 727, 736 (App.Ct. 1979). See also Hawes v. New Jersey Dept. of Transp., 232 N.J. Super. 160, 163, 556 A.2d 1224 (Law Div. 1989), citing Hayes v. State, 11 Cal.3d 469, 471-472, 113 Cal. Rptr. 599, 601, 521 P.2d 855, 857 (1974). In *590 the context of the facts of this case, the State is liable if it created a condition which substantially enhanced the risk that automobiles inadvertently making contact with the median would be vaulted or catapulted into lanes of oncoming traffic.
We note the anomaly of evaluating the safety of the curbing of a highway median within the statutory framework of the reasonable user requirement of N.J.S.A. 59:4-1a. According to the evidence presented, the very purpose of such curbing is to alert drivers that their automobiles are in the process of going off the road so that they can take timely corrective actions, and to prevent such drivers from actually traversing the median into oncoming lanes of traffic. It is incongruous to suggest that a median can be "used with due care." Its very presence is to prevent drivers who are not exercising reasonable and appropriate caution from crossing into opposing lanes of traffic. To that extent, it is difficult to reconcile the functional purpose of a median with the hypothetical "reasonable user" standard contained in N.J.S.A. 59:4-1a.
This much conceded, the State owes the duty to insure that a median and curbing viewed in the context of a reasonable user of the highway are reasonably safe for their objectively intended use. We point out that a driver may make contact with a median notwithstanding his or her exercise of due care. An unanticipated blowout of a tire, for example, may cause an automobile to touch the curbing of the median. A driver may make contact with the median in an attempt to avoid a collision with another vehicle, or a pedestrian, or an object left unattended on the road. In these and in a myriad of hypothetical situations, an automobile driver, operating his vehicle with due care, may nevertheless come into contact with the curbing of a median. We deem it consistent with public policy and with the act's provisions that a median may be considered a dangerous condition where it fails to fulfill its essential purpose and substantially exacerbates the perils of everyday driving.
*591 We stress the limited contours of our opinion. We do not suggest that the State must construct or maintain a median that will, under all circumstances, prevent an automobile from crossing into oncoming lanes of traffic. Quite obviously, the boundaries of liability would be limitless if that were the law. Nor do we address whether, or under what circumstances, the State is obliged to construct a median at all. We merely hold that once the State has chosen that course the median should be reasonably safe for its intended purpose.
It is not unreasonable to require the State to anticipate that even drivers exercising due care may come in contact with the median for a variety of reasons. Nor is it imprudent to compel the State, once it has chosen to build a median, to construct and maintain curbing that might reasonably deflect a vehicle from its perilous course. At the very least, common sense dictates that the curbing of the median should be constructed and maintained so as not to substantially enhance the risk that an automobile coming in contact with it, for whatever reason, will be vaulted or catapulted into oncoming traffic.
In the course of our research, we have reviewed a series of recent California decisions which held that the reasonable user requirement does not relate to the foreseeable activities of third parties. See Swaner v. City of Santa Monica, 150 Cal. App.3d 789, 198 Cal. Rptr. 208 (Cal. App. 2 Dist. 1984); Mathews v. State, 82 Cal. App.3d 116, 145 Cal. Rptr. 443 (Cal. App. 5 Dist. 1978); Slapin v. Los Angeles Intern. Airport, 65 Cal. App.3d 484, 135 Cal. Rptr. 296 (Cal. App. 2 Dist. 1977); Curreri v. City and County of San Francisco, 262 Cal. App.2d 603, 69 Cal. Rptr. 20 (Cal. App. 1 Dist. 1968). These decisions have held that public entity liability may be imposed even where the activities of third parties which cause injury are negligent, reckless or criminal as long as such acts are reasonably foreseeable. In Swaner v. City of Santa Monica, for example, the California Court of Appeal held that plaintiffs stated a viable cause of action against a public entity for injuries which they incurred as a result of a vehicle being negligently and criminally operated *592 on a public beach at night where there was no barrier separating the beach from the parking lot. 150 Cal. App.3d at 795-796, 198 Cal. Rptr. at 211. Similarly, in Slapin v. Los Angeles Intern. Airport, the court decided that a public entity could be held liable where plaintiff was assaulted in a dimly lit parking lot owned by the city. 65 Cal. App.3d at 490-491, 135 Cal. Rptr. at 299-300. Likewise, in Callahan v. City & County of San Francisco, 249 Cal. App.2d 696, 703-704, 57 Cal. Rptr. 639 (Cal. App. 1 Dist. 1967), the court held that a public entity may be liable to a passenger in a negligently driven vehicle where the city failed to adequately maintain the intersection where the accident occurred.
We recognize that our courts have historically referred to California decisions in construing our Tort Claims Act, because the Act was patterned after its California counterpart. See Speziale v. Newark Hous. Auth., 193 N.J. Super. at 419, 474 A.2d 1085; Kleinke v. Ocean City, 147 N.J. Super. 575, 579, 371 A.2d 785 (App.Div. 1977). We note, however, that these California decisions seemingly fail to comport with the thesis that public entities should be entitled to presuppose that their property will be used with due care. For reasons which will become apparent shortly, we need not determine whether these cases were correctly decided.
The instructions given by the trial court in this case did not in all respects conform with the principles we have enunciated. As we noted previously, the trial court charged the jury that the "reasonable user" requirement of N.J.S.A. 59:4-1a referred to plaintiff's conduct.
However, we are thoroughly convinced that the error committed was entirely harmless. We emphasize that plaintiff's expert, in concluding that the median and curbing presented a dangerous condition, assumed that Jones' vehicle was travelling at a lawful and reasonable rate of speed when it made contact with the median. In point of fact, in all of his calculations and assessments, Rich presupposed that Jones was *593 driving his automobile in a reasonable manner. Stated another way, Rich never hypothesized that Jones was speeding or driving recklessly. The entire thrust of Rich's testimony was that the median and curbing were dangerous because a reasonable user driving his automobile with due care, upon making contact with the curbing for whatever reason, would have been vaulted or catapulted into oncoming lanes of traffic. This was the essential point of plaintiff's case.
In a similar vein, the State's expert also hypothesized that Jones was neither speeding nor driving recklessly. The State's argument at trial was that a reasonable user's automobile would have been propelled across the median even if the eight inch barrier curb had been retained. In other words, Dr. Kornhauser concluded that an automobile driven at a reasonable and lawful speed would have been catapulted across the median into oncoming lanes of traffic regardless of the nature or type of the median's curbing.
In short, the common hypothesis in opining whether a dangerous condition existed was that Jones or for that matter any driver using the highway was exercising due care or at the very least was not driving recklessly when the vehicle came in contact with the median. Hence, the trial court's erroneous instruction on the reasonable use requirement had no impact on the jury's consideration of the question presented.
Nor do we perceive any prejudice flowing from the trial court's isolated allusion to "drunk or errant" drivers. This reference must be considered within the context of the allegations of the parties and the evidence presented at trial. As we have pointed out, at least to some extent, the State does bear the obligation of protecting innocent travellers from the dangers of drunk drivers. In the context of the evidence presented, the State could be held liable for exacerbating the perils attendant to drunk driving by creating a dangerous condition which propelled such vehicles into opposite lanes of traffic. Any error in this portion of the court's charge was harmless.
*594 In sum, it is apparent that both the plaintiff and the State employed the concept of the reasonable user in presenting their respective contentions to the jury. Plaintiff never argued below, and does not contend here, that the State must construct and maintain medians that protect against all forms of risks or dangers. The essential question presented to the jury was whether the State-owned road, in the context of the median and curbing, was reasonably safe for its objectively intended use. The jury fairly answered that question based upon the evidence presented to it. We are fully convinced that the error committed by the trial court was not capable of, and did not, produce an unjust result.

III.
We next address the State's argument there was no showing that the condition of the median was a proximate cause of the accident. As we noted earlier in our opinion, one of the essential statutory elements of a claim under N.J.S.A. 59:4-2 is that the dangerous condition was a "proximate cause" of a claimant's injury. In her attempt to satisfy this requisite, plaintiff presented Rich, a consulting engineer, who testified that "in all probability there would not have been contact [between] the Rhem [and Jones] vehicle[s]" had the State retained the eight inch barrier curbing. In contrast, the State's expert witness, Dr. Kornhauser, testified that "an eight inch curb ... would not have [resulted in] a redirection of" Jones automobile. Rather, the Jones vehicle, according to Dr. Kornhauser, "would have continued across [the median] and the collision would have occurred [in any event]." The State asserts that the evidence presented was insufficient to create a jury question with respect to the element of proximate cause.
We disagree. Of course, we recognize that "[i]n determining the existence of proximate cause, we must first inquire whether defendant's conduct constituted a cause in fact of plaintiff's loss." Kulas v. Public Service Elec. and Gas Co., *595 41 N.J. 311, 317, 196 A.2d 769 (1964). An act or omission "is not regarded as a cause of an event if the particular event would have occurred without it." Ibid., quoting Prosser, Torts, § 44 at 219-220 (1955). "[I]f the result would have happened as it did whether the alleged actor had done his duty or not, the failure to perform the duty was not a factor in the result, or, in other words, did not cause it." Kulas v. Public Service Elec. and Gas Co., 41 N.J. at 317, 196 A.2d 769, quoting Beale, "The Proximate Consequences of an Act," 33 Harv.L.Rev., 632, 637-638 (1920). Proximate cause is "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." Polyard v. Terry, 160 N.J. Super. 497, 511, 390 A.2d 653 (App.Div. 1978), aff'd o.b. 79 N.J. 547, 401 A.2d 532 (1979), quoting Fernandez v. Baruch, 96 N.J. Super. 125, 140, 232 A.2d 661 (App.Div. 1967), rev'd on other grounds 52 N.J. 127, 244 A.2d 109 (1968). Additionally, there may be two or more proximate causes of an injury with liability attaching to each, as long as each was a substantial factor in bringing about the result. Scott v. Salem County Memorial Hospital, 116 N.J. Super. 29, 33-34, 280 A.2d 843 (App.Div. 1971).
Against this backdrop, we find no merit in the State's argument. Rather, we conclude that the proximate cause issue was met directly by plaintiff's expert in opining that the accident would not have occurred had the eight inch barrier curb been retained. See Wooley v. Bd. of Chosen Freeholders, 218 N.J. Super. 56, 62-63, 526 A.2d 1116 (App.Div. 1987). We are convinced that, accepting as true all the evidence which supports plaintiff's position and according her the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ as to whether the condition of the median was a proximate cause of the decedent's death. See Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969).

*596 IV.
The State argues that the trial court erred by not deciding, as a matter of law, the DOT was free of liability for the condition of the median based on both "plan or design" immunity and "discretionary activities" immunity. We first consider the State's contention that plaintiff's claim was barred by plan or design immunity.
The operative statute, N.J.S.A. 59:4-6, provides in pertinent part as follows:
Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.
To be entitled to immunity under this section, the public entity must demonstrate that the injury was caused by an approved plan or design of the "original construction or any improvement thereto." The immunity accorded by N.J.S.A. 59:4-6 applies only to plans or designs for original construction or any improvements to original construction and not to routine maintenance activities. See Costa v. Josey, 83 N.J. 49, 53 n. 1, 415 A.2d 337 (1980). It "does not immunize a governmental body from responsibility for dangerous conditions created by its careless or negligent affirmative acts arising out of its maintenance as distinguished from improvements to its property." Ibid. See also Birchwood Lakes Colony Club v. Medford Lakes, 179 N.J. Super. 409, 432 A.2d 525 (App.Div. 1981), mod. 90 N.J. 582, 602, 449 A.2d 472 (1982). Beyond this, the "specific design or plan detail alleged to constitute the dangerous condition [must have been] the subject of prior governmental approval" in order for the immunity provision to apply. Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. 582, 599, 449 A.2d 472 (1982), quoting Ellison v. Housing Authority of South Amboy, 162 N.J. Super. 347, 351, 392 A.2d 1229 (App. Div. 1978). In other words, "in order for a public entity to avail *597 itself of the immunity ... the entity must demonstrate more than `that [the] works were constructed under a permit.'" Thompson v. Newark Housing Authority, 108 N.J. 525, 533, 531 A.2d 734 (1987), quoting Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. at 599, 449 A.2d 472. Rather, "[i]mmunity is to be afforded `only for an approved feature of the plan or design.'" Thompson v. Newark Housing Authority, 108 N.J. at 533-534, 531 A.2d 734, quoting Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. at 599, 449 A.2d 472. The purpose of plan or design immunity is "to avoid the danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested." Thompson v. Newark Housing Authority, 108 N.J. at 534, 531 A.2d 734, quoting Anderson v. City of Thousand Oaks, 65 Cal. App.3d 82, 89, 135 Cal. Rptr. 127, 131 (App.Ct. 1976). Hence, "it follows that there is no second-guessing unless the particular feature that causes the condition was in fact an `approved feature of the plan.'" 108 N.J. at 534, 531 A.2d 734. Finally, we observe that the immunity provided by N.J.S.A. 59:4-6 is an affirmative defense which the entity must plead and bear the burden of proof. Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. at 599-600, 449 A.2d 472.
We disagree with the State's assertion that "uncontradicted evidence" was presented establishing these statutory requisites. As we took pains to note in our recital of the facts, none of the documents pertaining to the 1970 project specifically referred to a deliberate decision to create a "super-elevation" of Route 30. The profile sheets and offset sheets do not show the original curb height or the height of the curb after completion of the project. From all that appears in the record, the project arguably involved routine maintenance. In any event, at the very least, a jury question was presented with respect to whether the plan or design embraced the specific feature that plaintiff contends created the dangerous condition resulting in the decedent's death. Moreover, a substantial issue was *598 presented as to whether Peterson actually approved the plan. As we mentioned previously, the offset sheets were post-dated and the work order was merely stamped with a facsimile of Peterson's signature. Peterson was not produced as a witness, and the project documents are suggestive of the thesis that he did not actually see them when he allegedly approved the plans.
The State's evidence was even less convincing with respect to the 1981 project. No written instructions were given. Kjetssa characterized the project as a "seat of our pants job." Both Kjetssa and Kee described the work as a maintenance function that was similar to filling in a pothole, "a patch job."
In short, we are convinced that a jury question was presented with respect to whether the State was clothed with plan or design immunity.

V.
Equally without merit is the State's argument that it was immune for both the 1970 and 1981 changes to the median based on "discretionary" immunity pursuant to N.J.S.A. 59:2-3c and d. These sections provide as follows:
c. A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;
d. A public entity is not liable for the exercise of discretion when in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.
Contrary to plaintiff's assertion, subsection c and d do not require "high-level planning decisions" as the predicate for immunity as does subsection a, which immunizes a public entity for an injury resulting from the "exercise of judgment or discretion...." See Brown v. Brown, 86 N.J. 565, 577, 432 A.2d 493 (1981); Longo v. Santoro, 195 N.J. Super. 507, 518, *599 480 A.2d 934 (App.Div. 1984). Rather, subsection c provides immunity to a public entity in connection with the exercise of its discretion in determining whether to provide the resources necessary for a particular governmental service. See Vanchieri v. New Jersey Sports & Exposition Auth., 201 N.J. Super. 34, 43-44, 492 A.2d 686 (App.Div. 1985), rev'd in part 104 N.J. 80, 514 A.2d 1323 (1986); Margolis and Novack, Title 59: Claims Against Public Entities, at 27 (1988). Subsection d creates a limited immunity for the exercise of discretion when, in the face of competing demands, a public entity determines whether and how to apply resources already committed. See Brown v. Brown, 86 N.J. at 577, 432 A.2d 493. See also Rochinsky v. State of N.J., Dept. of Transp., 110 N.J. 399, 541 A.2d 1029 (1988).
Within that analytical framework, we are convinced that questions relating to the application of the immunities provided by subsections c and d were properly submitted to the jury. First, with respect to subsection c, there is little in the record to support the State's assertion that the 1970 and 1981 projects involved the exercise of discretion in determining whether to provide the resources for the alterations in the median. Our reading of the trial transcript discloses a paucity of evidence relating to this subject. In any event, it cannot fairly be argued that the immunity provided by subsection c was established as a matter of law.
Perhaps a closer question is presented regarding the applicability of subsection d immunity, at least with respect to the 1981 project. The record reveals correspondence and internal memoranda by members of the DOT, evidencing the fact that various options and alternatives were considered in determining how best to alleviate problems resulting from the disintegration of the median. For example, some 14 months prior to the accident, Kee, in a memorandum to Kjetssa, suggested that the median be replaced with barrier curbing over three feet high. We do not know whether this alternative was actually considered. *600 However, another internal memorandum noted the continued deterioration of the median and, with some degree of prescience, observed that reduction of the curb face height created "a greater potential for cross-overs and headon collisions...."
However, assuming that officials in the DOT exercised discretion in determining how existing resources were to be allocated in the face of competing demands, the evidence nonetheless presented a jury question whether the agency's final decision was "palpably unreasonable." In light of the DOT's prognostication of danger attendant to reduction of the median curb height, the decision to merely asphalt the curbing might reasonably be considered "patently unacceptable." Kolitch v. Lindedahl, 100 N.J. at 493, 497 A.2d 183. Stated somewhat differently, a jury could reasonably find from the evidence that "no prudent person would approve of [the agency's] course of action or inaction." Ibid., quoting Polyard v. Terry, 148 N.J. Super. 202, 216, 372 A.2d 378 (Law Div. 1977), rev'd on other grounds 160 N.J. Super. 497, 390 A.2d 653 (App.Div. 1978), aff'd o.b. 79 N.J. 547, 401 A.2d 532 (1979).
We thus conclude that the "discretionary" immunity provided by N.J.S.A. 59:2-3c and d was not established as a matter of law and the question was properly submitted to the jury.

V.
We briefly comment on the State's contention that plaintiff's cross-examination of Richard Zylman "tainted" the trial. Zylman, a toxicologist, was presented by the State as an expert witness. Based on the blood samples taken from Jones at 7:30 a.m., Zylman concluded that, at the time of the accident, Jones had a blood alcohol content of .104%. Upon cross-examination, it was revealed that Zylman had suggested to various attorneys in unrelated cases that they induce their clients to lie in order to enable him to make false calculations. Zylman's *601 derelictions were the subject of much comment in plaintiff's summation.
We find no error in counsel's cross-examination of the witness. We note, however, that several of the attorney's comments in his summation would have been better left unsaid. In the context of this protracted trial, however, we perceive no error capable of producing an unjust result.
The judgment of the Law Division is affirmed.
NOTES
[1] "Profile sheets" are blueprint drawings depicting the roadway.
[2] "Offset sheets" consist of numerical measurements of the depth of paving material to be laid on the road surface at designated points in the roadbed. Apparently, a person with knowledge of how these plans are read would be able to determine that portions of the curb would be reduced to two inches. However, this necessarily assumes that the individual is aware of the original height of the curb (8"), which is not specified on the sheets.
[3] We note certain ambiguities in these decisions. These cases may be construed as barring public entity liability for negligent, reckless or criminal acts of a third party on publicly owned land. However, they may also be interpreted as simply holding that where public property is not defective public liability will not be imposed for injuries which result from the dangerous acts of third parties.