221 N.J. Super. 270 (1987)
534 A.2d 413
KARL KING, AN INCOMPETENT, BY HIS GUARDIAN AD LITEM NORAH KING; CHRISTOPHER KING, KENDRA KING, AND MEREDITH KING, INFANTS UNDER THE AGE OF 18 YEARS, BY THEIR GUARDIAN AD LITEM NORAH KING; AND NORAH KING, INDIVIDUALLY, PLAINTIFFS,
v.
PHYLLIS J. BROWN, STATE OF NEW JERSEY, COUNTY OF MONMOUTH, TOWNSHIP OF OCEAN, JOHN DOE, A FICTITIOUS NAME, AND JOHN DOE II THROUGH JOHN DOE XII, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 16, 1987.
Decided November 16, 1987.
*271 Before Judges GAULKIN, GRUCCIO and D'ANNUNZIO.
*272 Richard H. Mills argued the cause for appellants (Lautman, Henderson, Mills & Wight, attorneys).
Jacqueline M. Sharkey, Deputy Attorney General, argued the cause for respondent, State of New Jersey (W. Cary Edwards, Attorney General, attorney).
Vincent P. Valerio argued the cause for respondent, County of Monmouth (Sparks & Sauerwein, attorneys).
Ronald Prusek argued the cause for respondent, Township of Ocean (Lomell, Muccifori, Adler, Ravaschiere, Amabile & Pehlivanian, attorneys; Michael S. Paduano, on the brief).
The opinion of the Court was delivered by D'ANNUNZIO, J.A.D.
Plaintiffs appeal the grant of summary judgment in favor of the three public entity defendants. Plaintiffs eventually settled their claims against Brown, the individual defendant.
On August 8, 1983, Karl King was a pedestrian in Ocean Township attempting to cross Sunset Avenue from the south side to the north side. Sunset Avenue has two traffic lanes, one westbound and one eastbound. During his attempt to cross the eastbound lane, King ran into the right rear of a car being operated in an easterly direction by defendant Brown. The impact caused King to fall and strike his head. It is alleged that King sustained brain damage which has rendered him incompetent.
Judgment was entered in favor of the public entities on the ground that the condition which plaintiffs contended caused King's injury did not constitute a dangerous condition within the meaning of N.J.S.A. 59:4-2.[1] We agree and affirm.
*273 Plaintiffs' contentions are well expressed in the first page of plaintiffs' brief on appeal:
Plaintiffs' liability theory against the public entities was that the scene of Karl King's accident was a traffic nightmare, one at which there existed (a) substantial volume of pedestrian traffic back and forth across Sunset Avenue combined with (b) an extraordinarily high volume of vehicular traffic proceeding in and from many different directions at once, both on the roadway proper and from adjacent parking lots, parking areas, and driveways; yielding the result that (c) pedestrians in Karl King's position confronted an unreasonably great difficulty in making effective observations for their safety.
Sharpening their focus, plaintiffs alleged that Sunset Avenue was a very busy street due to retail commercial development on both sides of the street, diagonal parking on the north side of Sunset and the use of Sunset as part of a de facto jughandle for northbound traffic on State Highway 35. According to plaintiffs, these elements created "an unreasonably busy and complicated traffic situation."
Plaintiffs emphasize the effect of the de facto jughandle created by the State. Northbound Route 35 traffic desiring to cross the southbound lanes of Route 35 to travel west on Sunset Avenue was directed to local streets in lieu of a left hand turn from Route 35. These vehicles, proceeding north on Route 35, would pass the Sunset Avenue intersection, turn right onto Fairmount Avenue, proceed for one block and turn right onto Allen Avenue, proceed for one block and turn right onto Sunset. After proceeding for one block on Sunset, the vehicles would be at its intersection with Route 35 facing west.
Although plaintiffs emphasize and rely on the effect of the jughandle on Sunset Avenue traffic, the record is silent as to the volume of Sunset Avenue traffic attributable to the jughandle effect. Moreover, the Brown vehicle was not part of the *274 jughandle traffic. Brown was proceeding eastbound on Sunset.[2]
Similarly, the significance to this case of diagonal parking on the north side (westbound lane) of Sunset is dubious. King ran into the Brown car on the south side of the street. There is no evidence that he was struck by a vehicle while it was backing out of a diagonal parking space.
The trial judge did not base his decision on these weaknesses in plaintiffs' liability theory. Relying on Sharra v. City of Atlantic City, 199 N.J. Super. 535 (App.Div. 1985) (bicyclist using boardwalk knocked down by other bicyclist); Rodriguez v. N.J. Sports and Exposition Authority, 193 N.J. Super. 39 (App.Div. 1983), certif. den. 96 N.J. 291 (1984) (criminal attack in parking lot of sports complex) and Setrin v. Glassboro State College, 136 N.J. Super. 329 (App.Div. 1975) (student assaulted during a racial incident), the trial judge ruled that for a dangerous condition to exist there must be a defect in the property such as a hole in the roadway or a protruding manhole cover. We understand the trial judge to mean, in line with the previously cited cases, that the phrase dangerous condition, as defined in N.J.S.A. 59:4-1a., does not refer to activity on the property. Sharra v. City of Atlantic City, supra, 199 N.J. Super. at 540. Our understanding of the trial judge's ruling is consistent with the parties' arguments on appeal.
We agree that plaintiffs cannot prevail on their theory that the volume of vehicular and pedestrian traffic on Sunset Avenue constituted a dangerous condition within the meaning of N.J.S.A. 59:4-1a and 4-2. However, we do not rest our affirmance on a distinction between physical defects in public property and activities on that property. In our view, a condition of public property which is safe for one activity may become a dangerous condition when the property is converted *275 to a different activity. For example, a bridge designed solely for pedestrian use may become dangerous when converted to use by vehicular traffic if its structure cannot support the additional load. In most cases, application of the dangerous condition standard requires consideration of both the physical characteristics of the public property as well as the nature of the activities permitted on that property. Indeed, the definition of dangerous condition in N.J.S.A. 59:4-1a. requires consideration of the reasonably foreseeable use of the property. Cf. Speaks v. Jersey City Housing Auth. 193 N.J. Super. 405 (App.Div. 1984), certif. den. 97 N.J. 655 (1984) (bicycle thrown from defective window  use of area beneath defective window as play area constituted the dangerous condition). Consequently, we perceive no advantage in the adoption of a physical defect/activity dichotomy. Cf. B.W. King, Inc. v. West New York, 49 N.J. 318, 324 (1967) (criticizing "blind adherence" to the distinction between a municipality's proprietary function and its governmental function).
The issue is whether the legislature intended that a high volume of vehicular and pedestrian traffic, creating what is commonly referred to as traffic congestion, constitutes a dangerous condition. Statutory language, the policy behind the statute, concepts of reasonableness and legislative history are sources of legislative intent. Schapiro v. Essex County Freeholder Board, 177 N.J. Super. 87 (Law Div. 1980), aff'd. 183 N.J. Super. 24 (App.Div. 1982), aff'd 91 N.J. 430 (1982).
N.J.S.A. 59:4-1a. defines dangerous condition as "a condition of property that creates a substantial risk of injury when such property is used with due care...." Obviously, vehicular and pedestrian traffic, whether free-flowing or congested, involve risk of injury.
In the absence of due care, traffic congestion may enhance the risk of injury so that the risk becomes substantial. But the test is whether the condition complained of creates a substantial risk of injury despite the exercise of due care by motorists *276 and pedestrians. What constitutes due care depends on the variable element of risk of harm inherent in any situation. Arguably, heavy traffic poses a greater risk of collision than light traffic. But, the greater the risk, the greater the care required. Ambrose v. Cyphers, 29 N.J. 138, 144 (1959); Butler v. Acme Markets, Inc., 177 N.J. Super. 279, 286 (App.Div. 1981), aff'd 89 N.J. 270 (1982). Therefore, the exercise of due care in the circumstances of traffic congestion may require greater vigilance and lower vehicle speeds than would be required in light traffic conditions. There is nothing in the evidence in this case or in common experience to support an inference that the condition of Sunset Avenue was such that traffic congestion created a substantial risk of injury despite the exercise of due care by motorists and pedestrians. The report of plaintiffs' expert witness merely recites the density and nature of the business uses, parking patterns and "considerable traffic movement" on Sunset Avenue and concludes that "[a]s a result of the various conditions described pedestrian traffic ... is exposed to a dangerous condition."
Our resolution of this issue is consistent with the purpose and spirit of the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq. (the Act). The Act was adopted in 1972. The legislature recognized that "the area in which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done." N.J.S.A. 59:1-2. Consistent with this legislative declaration, the Act limits public entity liability. The general approach is one of public entity immunity "[e]xcept as otherwise provided by this act...." N.J.S.A. 59:2-1a. Any public entity liability established by the Act "is subject to any immunity of the public entity...." N.J.S.A. 59:2-1b.
In the comment to N.J.S.A. 59:2-1, the Report of the Attorney General's Task Force on Soverign Immunity, 1972, (Task Force Report) stated: "[T]he approach should be whether an immunity applies and if not, should liability attach. It is hoped that in utilizing this approach the courts will exercise restraint *277 in the acceptance of novel causes of action against public entities." Id. at 210. Our research has revealed no case in which entity liability was based on traffic congestion alone.
In New Jersey, the nation's most densely populated state, traffic congestion is a common problem which affects State, county and local roads.[3] In light of this fact, the legislature's expressed concern about government's almost limitless responsibility and the admonition to the courts to exercise restraint in the recognition of novel causes of action, we are satisfied that traffic congestion at Sunset Avenue did not create a dangerous condition within the meaning of the Act. The fact that the State may have added to the traffic volume on Sunset Avenue through its use of local streets as a jughandle adds nothing to plaintiffs' case because all traffic on a congested road had its source in some other public road or roads.
Plaintiffs reliance on the California case of Baldwin v. State, 6 Cal.3d 424, 491 P.2d 1121, 99 Cal. Rptr. 145 (Sup.Ct. 1972) is misplaced. In Baldwin, the court held that design immunity may be lost as the result of changed circumstances, "e.g. the large increase in traffic on Hoffman Boulevard since its construction in 1942." Id., 6 Cal.3d 429, 491 P.2d at 1123, 99 Cal. Rptr. at 147. The Attorney General's Task Force specifically rejected the Baldwin rule. Task Force Report, supra, at 223. Moreover, the dangerous condition found to exist in Baldwin was not merely traffic congestion. The dangerous condition was the absence of a left turn lane on a busy 55 m.p.h. highway. Because there was no left turn lane, traffic turning left from Hoffman Boulevard had to stop in the fast lane to await an opportunity to complete the turn. As a result there were many rear-end collisions caused by attempts to make left turns. Paradoxically, the Baldwin facts would more *278 closely resemble the present case if the State had not directed left turning Route 35 traffic to the de facto jughandle.
Affirmed.
NOTES
[1] This statute provides in part:

A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition.... N.J.S.A. 59:4-1a. provides:
Dangerous condition means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used.
[2] At oral argument, plaintiffs' counsel suggested that creation of the de facto jughandle constituted a design defect. No expert opinion was offered to support this suggestion.
[3] Plaintiffs' expert's description of Sunset Avenue activity would accurately describe countless urban and suburban streets in New Jersey.