626 A.2d 1091

RICHARD AND DARLENE LEVIN, HUSBAND AND WIFE; AND DARLENE LEVIN, AS GUARDIAN AD LITEM FOR HER MINOR CHILDREN, LOUIS LEVIN AND JULIA LEVIN, PLAINTIFFS–APPELLANTS, v. COUNTY OF SALEM, COUNTY OF CUMBERLAND AND CITY OF VINELAND, DEFENDANTS–RESPONDENTS, AND TOWNSHIP OF PITTSGROVE, DEFENDANT.

Argued January 19, 1993—Decided July 15, 1993.

36

*William G. Wright* argued the cause for appellants (*Farr, Lyons, Burke, Gambacorta & Wright,* attorneys).

*Gerard W. Quinn* argued the cause for respondent County of Salem (*Cooper, Perskie, April, Niedelman, Wagenheim & Levenson,* attorneys; *Louis Niedelman,* of counsel).

*David J. Eddowes* argued the cause for respondent County of Cumberland (*Davidow, Sherman, Eddowes & Geiger,* attorneys).

*L. Patricia Sampoli* argued the cause for respondent City of Vineland (*Horn, Goldberg, Gorny, Daniels, Paarz, Plackter & Weiss,* attorneys).

*Jerry Fischer,* Senior Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

The question in this case is whether the unauthorized use of public property for private recreational activities thereby puts the property "in dangerous condition" under *N.J.S.A.* 59:4–2 of the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to :12–3 (the Act or the New Jersey Act), when the recreational activities themselves are risky and pose danger to the participants. In this case a man dove from a county bridge into shallow tidal waters, suffering a paralyzing injury. We conclude that however tragic the accident, its cause was not the condition of the bridge but the dangers of unsupervised recreational activity for which there is no public-entity liability under the Act.

## I

For purposes of this appeal, we accept the statement of facts set forth in plaintiff's briefs. (For convenience, we refer only to the injured plaintiff, Richard Levin. The claims of the other plaintiffs are derivative.) On the evening of July 23, 1987, Levin and two companions stopped at the Garden Road Bridge (the bridge) between Pittsgrove and Vineland to swim in the Maurice River. They had arrived by automobile from the Cumberland County side of the bridge and had parked in the turnoff on the north side of the bridge, the Salem County side.

Many others were at or near the bridge on that evening. For decades local residents had used the bridge and the surrounding area along the Maurice River for swimming and diving. This local "swimming hole" spans the border between Vineland (Cumberland) on the east and Pittsgrove (Salem) on the west. When Levin arrived at the bridge, several people were diving from the bridge into the river, seven feet below the bridge span. After observing the divers, Levin went to the north side of the bridge. When he dove into the river, his head struck a submerged sandbar. As a result, he sustained a fracture of the sixth cervical vertebra and was rendered a quadriplegic.

The counties of Cumberland and Salem jointly own, maintain, and control the Garden Road Bridge and are responsible for the regulation of activities on or near it. At the site of the bridge, the Maurice River passes through a picturesque woodland area. Gently sloping banks descend to the river on each side, and a sandy bathing beach exists adjacent to it. The site has been used by the public as a local swimming hole and for other water-related activities, such as sunbathing, fishing, canoeing, swimming, and diving from the river bank. Levin, in fact, had frequented the site as a child, and his family had enjoyed several outings there. The present bridge was constructed to replace the steel truss bridge that had been on the site for many years. It serves a rural, two-lane road. The bridge has a parapet, or low wall, at its edge, separated from the road by a wide sidewalk. Visitors to the

bridge often used the parapet, which is twenty-seven inches high and twelve inches wide, as a diving platform.

The record contains evidence that defendants knew that the area surrounding the Garden Road Bridge was used as a recreational site and that the bridge itself was used as a diving platform. The artificial bathing beach, parking areas, footpaths, canoe-rental signs, and the large numbers of swimmers, divers, and fishers who congregated at the site were obvious indications to the public bodies that the bridge area had been used and was being used by the public as a recreational site. Recent photographs offered in evidence depicted young people diving head first from the bridge into the Maurice River below.

In 1978, seventeen-year-old Mary Lou Quesenberry had suffered a similar accident when she dove into the river. During the course of the subsequent lawsuit the defendants received an engineering report detailing the hazard inherent in the placement of a low bridge wall over a body of water known to be used for recreation. The report indicated that the hazard at the site was the product of constantly-shifting sandbars below that part of the bridge where one would believe the water was the deepest, combined with the coloration of the water. The waters of the Maurice River are of a reddish color, commonly referred to as cedar water. The sandbars resulted from the widening of the river channel when the bridge was constructed in 1971. The report had recommended that the counties (1) construct a protective screen or fence to bar access to the river from the bridge, (2) post effective signs on the bridge approaches and spans, and (3) police and supervise the recreational activities at the site. Notwithstanding those recommendations, at the time of Levin's accident neither county had altered the structure or design of the bridge. Since the filing of this suit, Salem County has erected a six-foot-tall chain-link fence on both sides of the Garden Road Bridge within its jurisdiction. At the end of the fence vertical "wingwalls" extend across the parapet and over the water, preventing access to the parapet behind the fence.

In 1986, the Salem County Board of Chosen Freeholders passed a resolution restricting access to county bridges and prohibiting swimming, fishing, or diving from any bridge. Plaintiff asserted that the resolution had not been enforced. Prior to plaintiff's accident, Salem County did not restrict access to the waters from the bridge or notify the public of the danger inherent in its use as a diving platform. Salem County maintained that it had posted signs on the bridge stating "no fishing, no loitering on bridge" and "no swimming from bridge by order of Freeholders," although plaintiff disputed that those signs had been in place at the time of the accident. Cumberland County also maintained that it had posted "no diving" signs on the bridge, although it had never enacted an ordinance prohibiting diving at the bridge. Plaintiff disputed that these signs had been in place on the date of the accident. Plaintiff was unaware of any sign, ordinance, or prohibition restricting the use of the bridge and the surrounding area. He had often swum at the site, had never believed its recreational use was prohibited, and had often observed others diving from the bridge. He had never been informed that he should leave the area or restrict his activities, nor was he aware that anyone else had been so informed.

Plaintiff sued both counties and the two towns within each county, Pittsgrove and Vineland, that border the bridge. The trial court granted summary judgment in favor of all the public entities. Pittsgrove moved unopposed for summary judgment and was dismissed from the case. Plaintiff did not appeal that dismissal. Salem then moved for summary judgment. In granting Salem's motion, the trial court specifically found that (a) warning signs had been posted on the bridge at the time of the accident, (b) Salem County had passed an ordinance prohibiting diving from county bridges, and (c) the sole intended use for bridges is for vehicular and pedestrian traffic. The court found "as a matter of law [that] this bridge cannot be deemed to be a dangerous condition of public property."

After Salem's motion, defendants Vineland and Cumberland also moved for summary judgment. Vineland argued that because the

court had previously ruled that the bridge was not in dangerous condition, plaintiff could not sustain a cause of action against Vineland. Vineland further argued that the bridge was not "a property" of the municipality. Lastly, Vineland disputed plaintiff's allegation that the municipality had been negligent because at one time it had patrol cars on the bridge but at the time of the accident it did not. Vineland argued that a public entity does not have a duty to patrol property that does not belong to it. The court found Vineland's points essentially unrefuted and granted its motion. In granting Cumberland's motion, the court incorporated all of the reasons it had cited for granting Salem's motion that also applied to Cumberland. Presumably, the court's finding that the bridge was not "a dangerous condition" was one of those reasons.

The Appellate Division affirmed, substantially for the reasons stated by the Law Division in ruling on the summary-judgment motions. The Appellate Division considered itself bound by *Burroughs v. City of Atlantic City,* 234 *N.J.Super.* 208, 560 *A.*2d 725 (App.Div.), *certif. denied,* 117 *N.J.* 647, 569 *A.*2d 1345 (1989). We granted plaintiff's petition for certification, 130 *N.J.* 18, 611 *A.*2d 655 (1992). Plaintiff claims generally that the decisions of the lower courts constitute a gross miscarriage of justice. Because those decisions apply to defendants Salem, Vineland, and Cumberland, they have all responded to plaintiff's petition.

## II

We are required again to resolve the proper relationship between the liability and immunity provisions of the Act. *Rochinsky v. State, Department of Transportation,* 110 *N.J.* 399, 541 *A.*2d 1029 (1988), sets forth the principles applicable to an action brought under the Act.

Plaintiff alleges that the absence of adequate warnings on the bridge or the failure to supervise the recreational activities or to erect a fence at the edge of the bridge caused his injuries. Defendants assert that the unauthorized and, indeed, illegal use of the property caused the injuries. Plaintiff realizes that liability

cannot be based on the failure to supervise, because *N.J.S.A.* 59:2–7 specifically immunizes public entities from liability for the failure to provide supervision of public recreational facilities. *See, e.g., Stempkowski v. Borough of Manasquan,* 208 *N.J.Super.* 328, 333, 506 *A.*2d 5 (App.Div.1986) (affirming grant of summary judgment for borough because plaintiff's claim of failure to supervise could not sustain cause of action under *N.J.S.A.* 59:2–7). Plaintiff relies, however, on the proviso in *N.J.S.A.* 59:2–7 that "nothing in this section shall exonerate a public entity from liability for failure to protect against a dangerous condition as provided in chapter 4."

■ Chapter 4 of the Act, specifically *N.J.S.A.* 59:4–2, imposes liability on a public entity for injury caused by a condition of its property "if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, [and] that the dangerous condition created a reasonably foreseeable risk of the kind of injury * * * incurred." The plaintiff must also establish that the public entity was responsible either through its employees for creating the dangerous condition or had actual or constructive notice of the condition sufficiently before the injury to have taken measures to protect against the dangerous condition, provided that the entity will not be liable if the action taken to protect against the condition was not "palpably unreasonable." *Ibid. N.J.S.A.* 59:4–1.a. defines "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

Defendants' principal argument before us is that to use property illegally cannot be to use it with due care, no matter how reasonably foreseeable the use. Applying that principle to Salem County, the fact that the public body had adopted a resolution forbidding diving from the bridge would immunize it from liability. We do not find that to be a satisfactory principle of decision. Were it so, a public entity could easily insulate itself from liability with respect to dangerous conditions of its property merely by

enacting ordinances that, for example, would direct parties not to walk near the edge of a broken railing or near the weakened portion of a floor in public facilities.

Rather, we believe that the issues here require us to identify the culpable cause of the accident and to ask if that "identified cause or condition is one that the Legislature intended to immunize." *Weiss v. New Jersey Transit*, 128 *N.J.* 376, 380, 608 *A.*2d 254 (1992). With respect to the defendants, we perceive only three possible culpable causes of the accident: (1) the design of a bridge with a parapet low enough for divers to scale it and dive into the waters; (2) the failure of the public bodies either to adopt or to enforce ordinances with attendant descriptive signs prohibiting the activities; or (3) the failure of the public bodies to supervise the recreational activities that they knew were taking place on the bridge. Concerning the first point, if the dangerous condition of the property were the omission of a chain-link fence from the original design of the bridge, that omission would be insulated from liability by the plan-or-design immunity granted under *N.J.S.A.* 59:4–6. Concerning the second and third points, plaintiff recognizes, as he must, that the failure to adopt or to enforce laws and the failure to supervise public recreational facilities are insulated from liability under specific immunities of the Act, respectively, *N.J.S.A.* 59:2–4 and –7.

As noted, however, plaintiff rests his argument on *N.J.S.A.* 59:4–2. Plaintiff contends that the use of the property as a recreational facility, when the public body knew of the use, created a dangerous condition of property. He claims that the absence of signs or other interdiction contributed to the dangerous condition. He submits that a jury should have been permitted to decide (1) if the property was being used with due care, in a way that was reasonably foreseeable to defendants, and (2) if such use created a dangerous condition on the property. Plaintiff relies on language in *Burroughs, supra,* that "whether a dangerous condition is present depends on a combination of factors relating to physical condition, permitted conduct, and objectively foreseeable behav-

ior." 234 *N.J.Super.* at 218–19, 560 *A.*2d 725. In *Burroughs,* an ocean-beach boardwalk used primarily for walking, jogging, and cycling had been adapted, because of its proximity to the water, to a use not intended: diving. If Atlantic City, knowing of the diving, had done nothing to prohibit that unintended use, diving could have become a tacitly-permitted use. The *Burroughs* court declined to find liability, however, because the City had posted signs prohibiting diving from the boardwalk and its lifeguards had been instructed to stop the activity when they observed it. *Id.* at 219, 560 *A.*2d 725. Plaintiff asserts that he has established a factual issue in this case by demonstrating that the public bodies had not effectively interdicted diving and thus had tacitly permitted the use.

We are concerned that the premise of the *Burroughs* case on which plaintiff relies, namely, that a dangerous condition of property may arise from a "combination of factors relating to physical condition, permitted conduct, and objectively foreseeable behavior," *id.* at 218–19, 560 *A.*2d 725, may be too broad in the context of this case. Heretofore, courts have understood a "dangerous condition" as defined in *N.J.S.A.* 59:4–1.a to refer to the "physical condition of the property itself and not to activities on the property." *Sharra v. City of Atlantic City,* 199 *N.J.Super.* 535, 540, 489 *A.*2d 1252 (App.Div.1985) (citing *Rodriguez v. N.J. Sports & Exposition Auth.,* 193 *N.J.Super.* 39, 472 *A.*2d 146 (App.Div.1983), *certif. denied,* 96 *N.J.* 291, 475 *A.*2d 586 (1984)); *accord Cogsville v. City of Trenton,* 159 *N.J.Super.* 71, 386 *A.*2d 1362 (App.Div. 1978) (holding that exposure to dog bites from allegedly vicious dog owned by tenant in city dwelling did not constitute dangerous condition of property); *Setrin v. Glassboro State College,* 136 *N.J.Super.* 329, 346 *A.*2d 102 (App.Div.1975) (holding that criminal conduct of one student in attacking another student during on-campus racial incident did not constitute dangerous condition of property).

In *King by King v. Brown,* 221 *N.J.Super.* 270, 534 *A.*2d 413 (App.Div.1987), the court considered the activity on the property, in addition to its physical condition, in deciding whether a danger-

ous condition existed. There, Brown, a motorist, struck the plaintiff, a pedestrian, as he attempted to cross a municipal roadway. Plaintiff argued that three public entities responsible for the design of the highway area should be liable for his injuries because the combination of a high volume of vehicular and pedestrian traffic had created a dangerous condition of property. *Id.* at 273–74, 534 *A.*2d 413. In finding for the public entities, the *King* court stated that "application of the dangerous condition standard requires consideration of both the physical characteristics of the public property *as well as the nature of the activities permitted on that property.*" *Id.* at 275, 534 *A.*2d 413 (emphasis added). However, the *Burroughs* court observed that because the motorist and the pedestrian in *King* "were both *using the public property for its permitted and intended purpose, i.e.,* for pedestrian and vehicular traffic, 'foreseeable' use was not an issue." 234 *N.J.Super.* at 217, 534 *A.*2d 413 (emphasis added). Thus, the *Burroughs* court concluded that the test enunciated in *King*, that is, " 'whether the condition complained of creates a substantial risk of injury despite the exercise of due care,' " presumed that the use of the public premises was a permitted one. *Id.* at 218, 534 *A.*2d 413 (quoting *King, supra,* 221 *N.J.Super.* at 275, 534 *A.*2d 413).

Furthermore, we suspect that the *Burroughs* doctrine, on which plaintiff relies, would effectively eliminate the plan-or-design immunity conferred under *N.J.S.A.* 59:4–6. The counties designed the bridge to carry traffic and pedestrians. Usually the form of an object follows its function. *See* David Outerbridge, *Bridges* 8 (1989). The plan-or-design immunity shelters the bridge designers' decision to accept or reject the concept of posting a chain-link fence along the sides of this rural span. *Compare, Daniel v. State, Dep't of Transp.,* 239 *N.J.Super.* 563, 571 *A.*2d 1329 (App. Div.) (presenting jury question on whether State could claim plan-or-design immunity because specific feature allegedly creating dangerous condition—a "ramp" that could "catapult" cars across highway median—arguably was result of routine maintenance work rather than an approved feature of plan or design), *certif. denied,* 122 *N.J.* 325, 585 *A.*2d 343 (1990). Declining to follow the

approach of California, the Legislature states in the official Comment to *N.J.S.A.* 59:4–6 that "[i]t is intended that the plan or design immunity provided in this section be perpetual." "[O]nce the immunity attaches," the Comment continues, liability for changed circumstances affecting a plan or design "has been specifically rejected as unrealistic and inconsistent with the thesis of discretionary immunity." Plan-or-design immunity is not perpetual under California law. *See Baldwin v. California,* 6 *Cal.*3d 424, 99 *Cal.Rptr.* 145, 491 *P.*2d 1121 (1972).

### III

In other essentials, however, the California Tort Claims Act was the model for the New Jersey Act. *Speaks v. Jersey City Housing Auth.,* 193 *N.J.Super.* 405, 411–12, 474 *A.*2d 1081 (App. Div.), *certif. denied,* 97 *N.J.* 655, 483 *A.*2d 177 (1984). Accordingly, to look to California for guidance in interpreting the Act is logical. California tends to view the issue of responsibility for the injury in terms of causation: Is there some defect in the property that caused the injury or is there some other cause of the injury? *Campbell v. City of Santa Monica,* 51 *Cal.App.*2d 626, 125 *P.*2d 561 (1942), a case that arose under the California Public Liability Act (predecessor to the California Tort Claims Act), provides a slightly-obverse example of the problem with the Garden Road Bridge. In that case, the driver of an unauthorized *motor vehicle* negligently traversed a promenade constructed for *pedestrian* traffic and injured a pedestrian. The court reasoned that the liability imposed for a dangerous or defective condition of public streets and property does not extend to activities on the property, such as motor vehicles entering on streets or highways, but only against risks directly due to physically dangerous or defective streets or sidewalks.

> Here the Promenade itself was neither dangerous nor defective. The harm in this case was caused, not by the condition of the Promenade or the want of barriers or signs barring its use by vehicles without a permit, but by the negligent operation of a motor vehicle. * * * The city owed the plaintiffs no duty to restrict the use nor to barricade against motorists who did not hold permits to use it. The Promenade

is not dangerous nor defective just because it is so constructed that motor vehicles can readily drive upon and along it.

[*Id.* 51 *Cal.App.*2d at 629–30, 125 *P.*2d at 563.]

Other California cases, interpreting that state's Tort Claims Act, have followed the *Campbell* court's interpretation of dangerous condition of public property.

A study of the cases interpreting section 830 [of the California Tort Claims Act covering a dangerous condition of property] and its predecessor acts shows that they interpret section 830 as requiring the *physical condition* of the public property to be in a dangerous or defective condition involving reasonable risk to the public. In *Campbell v. City of Santa Monica* * * *, [51 *Cal.App.*2d 626] 125 *P.*2d 561 * * * the court said, * * * "harm in this case was caused, not by the condition of the Promenade or the want of barriers or signs barring its use by vehicles without a permit, but by the negligent operation of a motor vehicle."

[*Sykes v. County of Marin,* 43 *Cal.App.*3d 158, 161, 117 *Cal.Rptr.* 466, 468 (1974) (emphasis added).]

*Bartell v. Palos Verdes Peninsula School District,* 83 *Cal. App.*3d 492, 147 *Cal.Rptr.* 898 (1978), is a case much like ours. Even though the school district allegedly knew that children used its playground for skateboarding and took no measures to prevent the activity, the court found that plaintiffs failed to state a cause of action for a "dangerous condition of public property" because the injury was the direct result of the childrens' dangerous conduct, not a defect in the physical condition of the property.[1] The *Bartell* court cited *Campbell* as well for the proposition that a physical defect in the property must exist as a precondition to public-entity liability. *Id.* 83 *Cal.App.*3d at 497, 147 *Cal.Rptr.* at

---

[1] In *Torkelson v. City of Redlands,* 198 *Cal.App.*2d 354, 17 *Cal.Rptr.* 899 (1961), the court found a dangerous condition of property to exist when a child at play was swept by storm waters into an unfenced drain. However, the *Bartell* court later distinguished *Torkelson* on the grounds that the cause of the injury was an "inherent danger or dangerous design of the property itself," 83 *Cal.App.*3d at 498 n. 4, 147 *Cal.Rptr.* at 900 n. 4, for which the California Tort Claims Act does not extend perpetual immunity to public entities. *See supra* at 46, 626 A.2d at 1096. We note that the New Jersey Act would immunize the defective design of a storm drain under *N.J.S.A.* 59:4–6, as well as any design feature of the Garden Road Bridge.

900. True, the California cases are not in perfect accord, but most appear to preserve that distinction. In *Fredette v. City of Long Beach*, 187 *Cal.App.*3d 122, 231 *Cal.Rptr.* 598 (1986), the claimant was injured when he dove from a pier under reconstruction, which had previously led to a water float used as a diving platform. The jury found no dangerous condition of property. The appeals court affirmed, observing that "[c]ases holding public entities liable for failure to warn of dangerous conditions are based on the presence of an actual dangerous physical defect or an otherwise dangerous condition which was not apparent to persons using the property with due care." *Id.* 187 *Cal.App.*3d at 131–32, 231 *Cal.Rptr.* at 603.

The California Supreme Court has tilted in both directions. In *Hayes v. California*, 11 *Cal.*3d 469, 113 *Cal.Rptr.* 599, 521 *P.*2d 855 (1974), the court, refusing to impose liability for injuries sustained on public property due to inadequate security, emphasized that some physical feature of the property has been at least a contributing defect if not *the* defect in decisions imposing liability for injury caused by a dangerous condition of property.[2] Later, in *Peterson v. San Francisco Community College District*, 36 *Cal.*3d 799, 205 *Cal.Rptr.* 842, 685 *P.*2d 1193 (1984), the court held that a public-school authority that failed to trim foliage in a secluded part of the school property or to warn of the danger of criminal acts could be held liable for maintaining a dangerous condition of public property. The court emphasized, however, the special relationship between the public entity and the student as invitee

---

[2] In so ruling, the *Hayes* court vacated the Court of Appeals decision, which had ruled that

[t]he statute [allowing recovery based on a dangerous condition of property] is not restricted to the inherent quality of the property itself, but rather focuses on the impact of the condition upon the environment or users. It is the effect which determines whether a dangerous condition exists, not the inner nature of the property. Whether a dangerous condition exists can only be determined by examining the total quantum of facts pertinent to a controversy.

[*Hayes v. California*, 111 *Cal.Rptr.* 856, 862, (1973) (citations omitted).]

and found that the factors of prior assaults and the failure to trim the foliage "indicate that there is moral blame attached to the defendants' failure to take steps to avert the foreseeable harm." *Id.* 36 *Cal.*3d at 814, 205 *Cal.Rptr.* at 851, 685 *P.*2d at 1202.

The corollary of the proposition—that we look to effects to determine whether a dangerous condition of property exists—would be that whenever danger exists, so does a dangerous condition of property. Heretofore our cases have not taken that approach. To do so now would require disapproval of many prior decisions both of this Court and lower courts, such as *Weiss v. New Jersey Transit, supra,* 128 *N.J.* 376, 608 *A.*2d 254 (we could have characterized the grade crossing as a dangerous condition of property, but did not), and *Stempkowski v. Borough of Manasquan, supra,* 208 *N.J.Super.* 328, 506 *A.*2d 5 (the Appellate Division could have found the unguarded beach to be a dangerous condition of property, but did not).

Of course, a physical defect in the property, for example, a missing window, combined with the foreseeable neglect or misconduct of third parties, may result in the imposition of liability on the public entity because the combination renders the property unfit. Some conditions of the property itself impair the safety of its intended or foreseeable uses. *See, e.g., Speaks, supra,* 193 *N.J.Super.* at 412, 474 *A.*2d 1081 (finding that housing authority's failure to replace missing window created dangerous condition in common yard frequented by children directly under window when foreseeable risk existed that someone would drop or throw object out of window).

## IV

In this case, there was no missing plate, no broken bolt, no defect in the bridge itself that caused or contributed to cause the tragic accident. The danger arose because the bridge was where the shallow water was. No other activity or inactivity of the public entities in this case forms a basis for liability under the Act

(such as the failure to adopt or enforce laws prohibiting diving, or to provide supervision of the diving).

The judgment of the Appellate Division is affirmed.

STEIN, J., dissenting.

The majority holds that the Garden Road Bridge ("the Bridge") did not constitute a dangerous condition at the time of Levin's accident because the Bridge was not physically flawed. In reaching that result, the majority concludes that as a matter of law a dangerous condition cannot exist under *N.J.S.A.* 59:4–1a unless a physical defect exists in the public property. That conclusion is not supported by the language or the legislative history of the statute. The majority's limitation on public-entity liability under the Tort Claims Act, *N.J.S.A.* 59:1–1 to :12–3 ("the Act"), denies plaintiffs a jury trial to determine the possibility of compensation for injuries sustained in a tragic accident arising out of what plaintiffs assert was a reasonable and foreseeable use of the Bridge.

## I.

According plaintiffs the favorable inferences to which they were entitled on the motion for summary judgment, I find that the record discloses the following factual context for the issue before the Court. The Garden Road Bridge spans the Maurice River. The eastern end of the Bridge is in Vineland in Cumberland County and the western end is in Pittsgrove in Salem County. For decades, local residents have used the area around the Bridge as a bathing beach and have dived from the Bridge parapet into the river seven feet below. The Bridge has a parapet that is twenty-seven inches high and twelve inches wide. The parapet was designed to protect the edge of the Bridge and runs parallel to the road. It is elevated slightly above a wide sidewalk that lies between the parapet and the road. In 1978, Mary Lou Quesenberry, a seventeen-year-old, broke her neck and became a quadriplegic after having dived into the Maurice River from the Bridge.

She sued the Counties, and the parties ultimately settled the claim. In the course of the Quesenberry litigation, an engineering and safety report was prepared. The report detailed the hazard inherent in the placement of a low bridge wall over a body of water known to be used for recreation. The report offered recommendations to eliminate the hazard. It suggested erecting a protective fence to prevent access to the river from the Bridge. The report also suggested that the Counties supervise the site and post effective signs on the Bridge that would warn bathers of the hazard.

Salem County passed a resolution prohibiting swimming, fishing, or diving from any bridge. Cumberland County took no official action prohibiting the use of the Bridge for swimming and diving. Neither County implemented any of the suggested corrective measures.

As a child, plaintiff Richard Levin had enjoyed summer outings at this swimming hole with his family. He had been unaware of the Quesenberry incident. Having perceived no danger, he had dived from the Bridge on several occasions. Nearly five years ago, Richard and two friends had stopped at the Garden Road Bridge for an early evening swim. After watching several other bathers dive off the Bridge, Richard dived from the north side of the Bridge into the river. He hit his head on a sandbar below the water's surface, broke his sixth cervical vertebra, and became a quadriplegic. Richard Levin and his wife filed an action against Cumberland and Salem Counties and the Cities of Vineland and Pittsgrove.

In support of its motion for summary judgment, Salem County submitted several sworn statements asserting that "no swimming" and "no diving" signs had been posted at the Bridge. The County also relied on its ordinance prohibiting diving from the Bridge.

In opposition to defendant Salem County's motion for summary judgment, plaintiffs' expert certified that on several different days after Richard's accident numerous families had used the Bridge site for recreational activities. They had swam in the river and

jumped, dived, and performed stunts from the Bridge. Plaintiffs offered photographs of those activities. They also offered several certifications disputing the County's assertion that "no diving" signs had been posted on the Bridge.

The trial court determined that "there is no genuine issue of material [ ] fact and as a matter of law, [the] Bridge cannot be deemed to be a dangerous condition of [ ] public property." Accordingly, the court held that the County was immune from suit under the Tort Claims Act. The Appellate Division affirmed substantially for the reasons stated by the trial court.

## II.

*N.J.S.A.* 59:4–2 imposes liability on a public entity if

the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that * * *

* * * * * * * *

b. a public entity had actual or constructive notice of the dangerous condition * * * a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

A public entity, however, is not liable unless the action it takes or fails to take is palpably unreasonable. *N.J.S.A.* 59:4–2b. A dangerous condition is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4–1a. There are two distinct prongs to the statutory definition of dangerous condition. First, the property must be "used with due care." Second, the property also must be used in a manner that is reasonably foreseeable. Each of these definitional prongs has distinct implications. However, the threshold inquiry is whether plaintiffs have raised a genuine issue of material fact in respect of the existence of a dangerous condition. Because the New Jersey Tort Claims Act was modeled after the California Tort Claims Act, an inquiry into California law is instructive. *Chatman v. Hall,* 128 *N.J.* 394, 411,

608 *A.*2d 263 (1992); *Rochinsky v. New Jersey Dep't of Transp.,* 110 *N.J.* 399, 407, 541 *A.*2d 1029 (1988).

The California Tort Claims Act, adopted in 1963, illustrates what I believe is the correct interpretation of the requirement that property be used in a manner that is reasonably foreseeable. The majority equates reasonably-foreseeable use with intended use. The California Act, however, suggests a more expansive interpretation of the definition. Its definition of dangerous condition is virtually identical to that in *N.J.S.A.* 59:4–1a. Section 830(a) of the California Government Code defines dangerous condition as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." In its comment to that section, the California Law Revision Commission stated:

> A "dangerous condition" is defined in terms of "foreseeable use." This does not change the pre-existing law relating to cities, counties and school districts. These entities are liable under Government Code [former] Section 53051 for maintaining property in *a condition that creates a hazard to foreseeable users even if those persons use the property for a purpose for which it is not designed to be used or for a purpose that is illegal. Acosta v. County of Los Angeles,* 56 *Cal.*2d 208, 14 *Cal.Rptr.* 433, 363 *P.*2d 473 (1961); *Torkelson v. City of Redlands,* 198 *Cal.App.*2d 354, 17 *Cal.Rptr.* 899.

> [*Cal.Law Revision Comm'n cmt.* to *Gov.Code* § 830 (emphasis supplied).]

In *Torkelson v. City of Redlands,* a child who had been playing in a drainage ditch drowned when she was swept into a water tunnel. 198 *Cal.App.*2d 354, 17 *Cal.Rptr.* 899 (1961). Finding that the defendant was not immune under the Public Liability Act, which preceded the Tort Claims Act, the California District Court of Appeal held that

> in determining whether public property constitutes a dangerous condition the use factor to be considered in making such determination includes not only its designed or originally intended use, but every other reasonably anticipated use and also any use actually being made of it, conditioned always upon the fact that the owning agency has knowledge of its actual use, and conditioned further that such use is not a mere casual one but a customary use.

[*Id.* 198 *Cal.App.*2d at 361, 17 *Cal.Rptr.* at 903.]

Although the drainage ditch was fit for its intended use, the court nevertheless concluded that whether a dangerous condition was created by the City's acquiescence in the children's use of the ditch was a question for the jury to resolve.

The California Supreme Court also considered the scope of public-entity liability for dangerous conditions. In *Acosta v. County of Los Angeles*, 56 *Cal.*2d 208, 14 *Cal.Rptr.* 433, 363 *P.*2d 473 (1961), the court reversed the grant of a summary judgment motion in favor of the defendant county, concluding that the plaintiff's violation of an ordinance prohibiting bicycle riding on certain sidewalks did not bar his suit under the Public Liability Act for injuries sustained when he fell off his bicycle after hitting a bump in the sidewalk. *Id.* 56 *Cal.*2d at 213, 14 *Cal.Rptr.* at 436, 363 *P.*2d at 476. That case established that a public entity may be liable for damages even though an injury arose out of a use of property for which it was not designed or intended. *See Torkelson, supra,* 198 *Cal.App.*2d at 359, 17 *Cal.Rptr.* at 902 (citing *Acosta, supra,* 56 *Cal.*2d 208, 14 *Cal.Rptr.* 433, 363 *P.*2d 473).

The question under California law is not, as the majority suggests, *ante* at 46, 626 *A.*2d at 1096, whether there is some defect in the property that caused the injury. Rather, the question is whether, when used in a foreseeable manner, public property or a condition thereof may pose a substantial risk of injury to a foreseeable user. *Torkelson, supra,* 198 *Cal.App.*2d 354, 17 *Cal. Rptr.* 899. The majority relies on *Campbell v. City of Santa Monica,* 51 *Cal.App.*2d 626, 125 *P.*2d 561 (1942), in support of its assertion that under California law a dangerous condition cannot exist absent a physical defect in the public property. That case involved an unauthorized motor vehicle that negligently entered onto a pedestrian promenade and injured a pedestrian. The court found that "[t]he harm in this case was caused, not by the condition of the Promenade or the want of barriers or signs barring its use by vehicles without a permit, but by the negligent operation of a motor vehicle." *Id.* 51 *Cal.App.*2d at 630, 125 *P.*2d

at 563. Thus, the City's immunity stemmed from the negligence of the third party and not from the lack of a physical defect in the property. Unlike the situation in *Torkelson*, the City's failure to prevent or warn against the negligent use of the promenade by a motor vehicle was not tantamount to an approval of that use that would have rendered the event foreseeable within the dictates of section 830(a) of the California Government Code.

The majority cites two California Supreme Court decisions, *Hayes v. California*, 11 *Cal.*3d 469, 113 *Cal.Rptr.* 599, 521 *P.*2d 855 (1974), and *Peterson v. San Francisco Community College Dist.*, 36 *Cal.*3d 799, 205 *Cal.Rptr.* 842, 685 *P.*2d 1193 (1984), for the proposition that California's highest court has "tilted in both directions," *ante* at 48, 626 *A.*2d at 1097, on the question whether the term "dangerous condition" requires a defect in the property itself. However, the California Supreme Court's rejection of public-entity liability in *Hayes* was based on a claim for damages arising out of an assault on two college students who were using the university's beach at night, and who contended that the prevalence of crime rendered the beach an unsafe area and, consequently, a dangerous condition of public property. The *Hayes* court rejected the contention that the university had a duty to warn about the well-known danger of violent crime, concluding that the susceptibility of users of the university's beach to violent attacks by third parties did not create a dangerous condition of public property. 11 *Cal.*3d at 472, 113 *Cal.Rptr.* at 602, 521 *P.*2d at 858. In *Peterson*, however, its latest pronouncement on the question, the court was confronted with a claim for damages based on an assault of a student ascending a stairway in the school's parking lot, no claim whatsoever having been asserted that the stairway was defective or unfit for its intended use. The Community College was aware that other assaults had occurred in that area and that the thick and untrimmed foliage and trees that adjoined the stairway created a condition conducive to attacks on students leaving the parking lot. Noting that the plaintiff had been attacked in broad daylight in an area of the campus where school officials had reason to anticipate students would be vulnera-

ble to attack, the California Supreme Court concluded that the thick and untrimmed foliage and trees around the parking lot and stairway, combined with the circumstance of prior attacks on students in the same area, were sufficient to create a "dangerous condition" of property within the meaning of the California Tort Claims Act. *Peterson, supra*, 36 *Cal.*3d at 812–13, 205 *Cal.Rptr.* at 850–51, 685 *P.*2d at 1201–02.

This Court previously has not considered· whether a dangerous condition exists for the purpose of liability under *N.J.S.A.* 59:4–2 when a member of the public is injured while using public property in a foreseeable or tacitly-permitted manner. However, in *Burroughs v. City of Atlantic City*, 234 *N.J.Super.* 208, 560 *A.*2d 725, *certif. denied*, 117 *N.J.* 647, 569 *A.*2d 1345 (1989), the Appellate Division, considering a claim similar to the one before us, suggested that the foreseeability of a specific use of public property was material in determining whether the property constituted a dangerous condition. *Burroughs* involved a plaintiff who had dived off an ocean-beach boardwalk and struck his head on the ocean bottom. He had broken his neck and become a quadriplegic. Diving from the boardwalk was specifically prohibited and warning signs had been posted. Lifeguards regularly prevented visitors from diving off the boardwalk and on occasion had called on the local police to assist in that effort. A lifeguard, who had seen the Burroughs party drinking alcohol and smoking marijuana prior to the accident, had warned the group to stay out of the water for their own safety. The *Burroughs* court considered whether the proximity of the boardwalk to the ocean constituted a dangerous condition for purposes of liability under *N.J.S.A.* 59:4–2. The court concluded that "whether a dangerous condition is present depends on a combination of factors relating to physical condition, permitted conduct, and objectively foreseeable behavior." *Id.* at 218–19, 560 *A.*2d 725. It found that although the boardwalk was intended for recreational uses, those uses did not include diving. The court found that a dangerous condition did not exist and that the legislature had not intended to expose Atlantic City to liability in a situation in which the boardwalk was

safe for its intended use, diving was prohibited by a city ordinance, and Atlantic City had "posted signs to that effect and instructed its employees to stop the prohibited activity when it is observed." *Id.* at 219–20, 560 *A.*2d 725.

The Court apparently rejects the holding in *Burroughs* that a dangerous condition may arise from a "combination of factors relating to physical condition, permitted conduct, and objectively foreseeable behavior." *Id.* at 218–19, 560 *A.*2d 725. Instead, it concludes that a " 'dangerous condition' as defined in *N.J.S.A.* 59:4–1a [ ] refer[s] to the 'physical condition of the property itself and not to activities on the property.' " *Ante* at 44, 626 *A.*2d at 1095 (quoting *Sharra v. City of Atlantic City*, 199 *N.J.Super.* 535, 540, 489 *A.*2d 1252 (App.Div.1985)). The Court finds support for its conclusion in *Sharra, supra,* and several other Appellate Division decisions, *ante* at 44, 626 *A.*2d at 1095, but that reliance may be misplaced. Those cases hold that a public entity is not liable for injuries to the plaintiff caused by actions of a third party on public property when the third party's actions were criminal, *Rodriguez v. New Jersey Sports & Exposition Auth.*, 193 *N.J.Super.* 39, 44, 472 *A.*2d 146 (App.Div.1983) (finding that "liability cannot be visited upon the Authority under the Tort Claims Act by reason of the criminal assault and robbery of Rodriguez"), *certif. denied*, 96 *N.J.* 291, 475 *A.*2d 586 (1984); *Setrin v. Glassboro State College*, 136 *N.J.Super.* 329, 346 *A.*2d 102 (App.Div.1975) (holding that criminal conduct of one student in attacking another did not constitute dangerous condition), created a nuisance, *Cogsville v. Trenton*, 159 *N.J.Super.* 71, 386 *A.*2d 1362 (App.Div.1978) (declining to hold City liable for injuries sustained by minor plaintiff when bitten by dog belonging to tenant of city property), or were otherwise unforeseeable, *Sharra, supra,* 199 *N.J.Super.* 535, 489 *A.*2d 1252 (holding that racing cyclist on boardwalk did not constitute dangerous condition). Casting doubt on the precedential value of those cases, the Appellate Division recently commented:

We note certain ambiguities in these decisions. These cases may be construed as barring public entity liability for negligent, reckless or criminal acts of a third

party on publicly owned land. However, they may also be interpreted as simply holding that where public property is not defective public liability will not be imposed for injuries which result from the dangerous acts of third parties.

[*Daniel v. New Jersey Dep't of Transp.*, 239 *N.J.Super.*
563, 588 n. 3, 571 *A.*2d 1329 (App.Div.), *certif.*
*denied*, 122 *N.J.* 325, 585 *A.*2d 343 (1990).]

Both interpretations focus on the activities of a third party. Although the cases referred to in *Daniel* and relied on by the majority may inform a discussion of public-entity liability in the context of third-party activity, they are limited to that context and are inapposite to the issue before us.

*Daniel* reaffirmed the court's conclusion in *Burroughs* that " 'whether a dangerous condition is present depends on a combination of factors relating to physical condition, permitted conduct, and objectively foreseeable behavior.' " 239 *N.J.Super.* at 585, 571 *A.*2d 1329 (quoting *Burroughs, supra*, 234 *N.J.Super.* at 218–19, 560 *A.*2d 725). That formulation is consistent with decisions of the California courts both before and after our Legislature's enactment of our Tort Claims Act. This Court previously has acknowledged the particular significance of California decisions in the interpretation of the Tort Claims Act. See *Fuchilla v. Layman*, 109 *N.J.* 319, 334, 537 *A.*2d 652, *cert. denied sub nom. University of Medicine & Dentistry of N.J. v. Fuchilla*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). *Burroughs*, like *Torkelson*, concedes that a foreseeable use may constitute a dangerous condition.

In *King by King v. Brown*, 221 *N.J.Super.* 270, 274, 534 *A.*2d 413 (App.Div.1987), the plaintiff, who was hit by a car as he attempted to cross a street at a busy intersection, alleged that the high volume of vehicular and pedestrian traffic created a dangerous condition of public property within the meaning of *N.J.S.A.* 59:4–1a. The Appellate Division rejected the plaintiff's contention. However, it refused to embrace the view that a physical defect in public property is a prerequisite to recovery under the Act. Instead, the court adopted the view that

a condition of public property which is safe for one activity may become a dangerous condition when the property is converted to a different activity. For example, a bridge designed solely for pedestrian use may become dangerous when converted to use by vehicular traffic if its structure cannot support the additional load. In most cases, application of the dangerous condition standard requires consideration of both the physical characteristics of the public property as well as the nature of the activities permitted on that property. Indeed, the definition of dangerous condition in *N.J.S.A.* 59:4-1a requires consideration of the reasonably foreseeable use of the property.

[*Id.* at 274-75, 534 *A.*2d 413.]

That *King* involved a permitted use of the public property does not diminish the persuasiveness of that court's reading of *N.J.S.A.* 59:4-1a.

The majority has focused almost exclusively on intended or permitted uses of property as they relate to dangerous conditions. However, by doing so, the Court strays from the actual definition of dangerous condition as provided by statute. As stated above, a dangerous condition, as defined by *N.J.S.A.* 59:4-1a, arises when two factors are present. The property must be used in a manner that is reasonably foreseeable. As articulated in *Burroughs, Daniel,* and *King, supra,* I am confident that use in a reasonably foreseeable manner encompasses activities that are tacitly permitted as well as objectively foreseeable. That, of course, implicates an unintended use of public property as well as the intended use.

In addition to the foreseeability requirement, a dangerous condition is one that poses a substantial risk of injury when the property is being used with due care. The majority seems to have avoided a closer scrutiny of this portion of the statutory definition. The phrase "use with due care" invites a jury to examine whether a given plaintiff's conduct while engaging in a foreseeable activity amounts to an objectively reasonable use of the property.

Our courts often have described "due care" with regard to dangerous conditions as a basic matter of "common sense." *See Hawes v. New Jersey Dep't of Transp.,* 232 *N.J.Super.* 160, 164, 556 *A.*2d 1224 (Law Div.1988); *King, supra,* 221 *N.J.Super.* at 276, 534 *A.*2d 413; *Lytle v. City of Newark,* 166 *N.J.Super.* 191,

196, 399 *A*.2d 333 (Law Div.1979). Thus, once an activity is deemed foreseeable, it becomes important to focus on whether or not a person also acted reasonably while engaged in that activity. What constitutes a sensible use of property is a matter well within the ambit of the jury.

Whether a particular use of property constitutes use with due care "depends on the variable element of risk of harm inherent in any situation." *King, supra,* 221 *N.J.Super.* at 276, 534 *A*.2d 413. In *Daniel, supra,* the Appellate Division focused on the issue of "due care." The court decided that the phrase did not refer to the actual conduct of a given plaintiff. Rather, the court noted that "the infinite variety of situations that may arise ma[de] it impossible to fix the definite rules in advance of all conceivable conduct." Consequently, the court concluded that "the reasonable user requirement does not refer to the actual activities of the plaintiff or others. Rather it constitutes a personification of a community ideal of reasonable behavior." 239 *N.J.Super.* at 588, 571 *A*.2d 1329.

That court's reference to a community ideal standard implies that a plaintiff's conduct must be reasonable, and in determining whether the conduct is reasonable, a consideration of standards or customs of the community would be relevant. Thus, it is important to ask not only whether it was foreseeable that Richard Levin and other persons had used the bridge as a diving platform with the knowledge of defendants, but also, whether diving off the bridge was a reasonable "use" of the property as measured by community standards. The term reasonable does not denote "intended" or "permitted," but rather involves an assessment of whether persons similarly situated would tend to engage in certain conduct.

The definitional requirement of use with due care necessarily tempers the potential scope of a public entity's liability. It is not sufficient that a public entity be cognizant that its property is being used in a foreseeable manner that creates a substantial risk of injury. The use of the property must itself be reasonable.

Thus, if a few daredevils engaged in a foreseeable but highly dangerous use of public property, the governmental entity's failure to take precautions would not be palpably unreasonable.

Conduct that is regularly engaged in by members of the public exercising due care and tacitly permitted by a public body may constitute a reasonably-foreseeable use and thereby establish a dangerous condition under *N.J.S.A.* 59:4–1a. Furthermore, a tacitly-permitted use that differs from the originally-intended use may convert "safe" public property into a dangerous condition if the property is not safe for the officially-permitted use. See *Torkelson, supra,* 198 *Cal.App.*2d at 359–60, 17 *Cal.Rptr.* at 902–03 ("[A]ny established actual use which, being known to and acquiesced in by the public agency owner, has converted or enlarged the designed or originally intended use.").

Plaintiffs have presented material issues of fact with respect to their claims. The evidence proffered in opposition to defendants' motion for summary judgment is probative of plaintiffs' claim that the diving accident was proximately caused by a dangerous condition of public property. The record before the trial court reasonably suggests that a jury could find that diving from the Garden Road Bridge was a foreseeable use of the Bridge; that defendants had knowledge of that use; and that a reasonable person exercising due care might dive from the Bridge. In addition, whether defendants' acquiescence in the use of the Bridge as a diving platform created a substantial risk of injury to foreseeable users is for a jury to determine. Finally, plaintiffs allege sufficient facts to support a jury determination that defendants were palpably unreasonable in their failure to warn against or remedy the asserted dangerous condition of public property created by the Garden Road Bridge.

The Tort Claims Act was enacted "to reestablish a system in which immunity is the rule, and liability the exception." *Bombace v. City of Newark,* 125 *N.J.* 361, 372, 593 *A.*2d 335 (1991). As this Court frequently has recognized, " 'immunity is the dominant consideration of the Act.' " *Rochinsky, supra,* 110 *N.J.* at 408, 541

A.2d 1029 (quoting *Kolitch v. Lindedahl*, 100 *N.J.* 485, 498, 497 A.2d 183 (1985) (O'Hern, J., concurring). Under the Act, public entities are not liable for an injury unless liability is specifically provided for by statute. *Chatman, supra*, 128 *N.J.* at 402, 608 A.2d 263. Furthermore, liability can be imposed on a public entity only if that imposition is consistent with the entire Act. *Kolitch, supra*, 100 *N.J.* at 492, 497 A.2d 183. Nevertheless, when the Legislature has specifically provided for public-entity liability, this Court must give effect to its intention.

*N.J.S.A.* 59:4-2 exposes governmental bodies to liability for injuries caused by a dangerous condition if the conduct in respect of that condition was palpably unreasonable. That exception to the general rule of immunity can be traced to the justifiable public expectation that public entities will warn against or take action to prevent injury from known hazards. The failure to do so may suggest either that a particular activity, when engaged in with due care, poses no substantial risk of injury, or that the public entity's conduct was negligent or even palpably unreasonable. In authorizing public-entity liability for dangerous conditions, *N.J.S.A.* 59:4-1a, :4-2, the Legislature carefully balanced the competing interests of the public and the governmental units. *See Report of New Jersey Attorney General's Task Force on Sovereign Immunity* 220-21 (1972). That authorization reflects the Legislature's intention to secure to the public protection from government's palpably-unreasonable conduct. Notwithstanding that legislative directive, the majority ignores the plain statutory language and extends public-entity immunity to circumstances not within the intended scope of the Act. The majority's restrictive construction of the term "dangerous condition" detracts from the protection of the public contemplated by the Legislature's authorization of public-entity liability for dangerous conditions. It finds no justification in the policy, language, or history of the Tort Claims Act.

I would reverse the judgment of the Appellate Division and remand to the Law Division for a jury trial on plaintiffs' complaint.

Justice HANDLER joins in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN and GARIBALDI—5.

*For reversal and remandment*—Justices HANDLER and STEIN—2.